Item
(2). = 12 pages

Memorandum of Law
Tr. Ct. No. 14-CR-2389-B
Fred G. Martinez # 2061834

United States Courts
Southern District of Texas
FILED

AUG 3 0 2018

David J. Bradley, Clerk of Court

# Memorandum of Law
## Tr. Ct. Cause # 14-CR-2389-B

<u>Premise</u>: Petitioner, <u>Fred G. Martinez</u>, TDCJ#2061834, proceeds pro se and asserts that he is innocent, illegally confined, and deprived of his liberty. Petitioner <u>experienced fatal errors</u> in his trial, which led to a <u>wrongful conviction</u>. Any error is considered to lay prejudicy. If absent these errors, the outcome would have been different,
* <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d. 674.

Petitioner proves "by the preponderance of the evidence" of various U.S. Constitutional violations, that clearly affected the outcome of his trial, in which he is <u>entitled to relief</u>. These fatal errors include U.S. Constitutional violations of Due Process of Law, Ineffective Assistance of Counsel, Prosecutoral Misconduct, Judicial Misconduct, Conflicts of Interest, Coercion and Obstruction of Justice. In <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674, it states that a criminal defendant has the legal right to a "full and fair" trial, guaranteed by the 6th Amendment of the U.S. Constitution.

The law demands strict proof thereof, by clear and convincing evidence of an element of a crime. However, the State is found to have no real proof of a crime whatsoever,
* <u>Ex parte Barfield</u>, 697 S.W. 2d 420 (TCA 1985).

The Prosecution misconducted when they disrespected the "Rule of Law" by appropriating defective evidence in efforts of securing this conviction, and subsequently failed to correct issues known to be of defect,
* <u>Ex parte Ghahremani</u>, 332 S.W. 3d 470, 477 (TCA 2011);
  <u>Napue v. Ill</u>, 360 U.S. 264, 269.

"The right to counsel, is the right to [effective] assistance of counsel," guaranteed by the 6th Amendment of the Constitution; Counsel's conduct led to critical errors and created more than a reasonable division of loyalties,
* <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed 2d 674.

Defense Counsel demonstrated multiple acts of ineffectiveness and ill-practices, which ultimately led to a flawed defense, but for the Counsel's unprofessional errors, the results of this examination would have been different, * <u>Stokes v. State</u>, 298 S.W. 3d 428 (TCA 2009).

It is not merely that Petitioner was careless in understanding the consequences of the plea, but was deprived of all legal advice of the plea agreement; which therefore, rendering it unknowingly and involuntary. Not only had the Counsel's errors result in a disadvantage to the defense, but Petitioner factually proves these foul actions were deliberate and deceitful. To prove prejudice, the Petitioner must prove claim is meritorious,
* <u>Weinwright v. Sykes</u>, 433 U.S. 72, 97 S.Ct. 2497 (1977).

P.1

Petitioner is not an Attorney, and has the expectancy of proceeding to be liberally construed, in which he cannot be held to the same standards of Articulation as an Attorney, ° Henderson v. Beto, 309 F. Supp. 244; Bledsue v. Johnson, 188 F. 3d 250.

Although Petitioner is not an Attorney, he immediately recognized the numerous errors and injustice illustrated here-in.

A.  Ground One:  It is clear, with all evidenciary material at hand that the Counsel purposely labored under a "Conflict of Interest" out of a [desparate necessity] in efforts of rescuing his imprisoned father from the cruel confinements of prison. Counsel shows to have Clear and convincing motives for his deceiving Actions, and exhibited no movement to pursue a departure from Representation, because of the known conflicts, nor did he make effort to make his client aware of these conflicts.

The Court of Criminal Appeals only considers "Actual, significant Conflicts of Interest" At the time of the trial, the Counsel should have been aware of, and should have advised his client of in the particular case ° James v. State, 763 S.w. 2d 776 TCA (1989).

The burden is on the Petitioner to prove his case; showing a Conflict of Interest by a preponderance of the evidence, Odelugo, 443 s.w. 3d 136-137.

(1).   Petitioner retained Counsel on, or about Dec. 1st 2014, * (see Exhibit #12).

(2).   Counsel states, under oath, that his father began to petition the Courts for "Shock Probation" sometime in Dec. 2014, * (see Counsel's sworn Affidavit- Attach #3 p.1.1 )

(3).   Petitioner's case was tried on Jan. 2nd 2015, * (see Exhibit #13).

(4).   Counsel's father's Court Appearances, from Feb. 6-9, 2015. * (see Exhibits #7 through #10). Counsel testifies in father's behalf, proving Bias, * (see Attach #3 p.2.1 )

This schedule certainly proves a Real "Conflict of Interest," which Affected Petitioner's trial at all levels, and Counsel's "Motion to Withdraw" was filed after his father's trial, reinforcing the Conflict.

(5)   Counsel's "Motion to Withdraw", filed on Feb 20th 2015, * (see Exhibit #14).

It would be standard practice to petition a court for "Shock Probation" within 90-180 days of imprisonment, for consideration, * (See Exhibit #6).

Mr. David Bonilla (Counsel's father) distinctly shows to have been negotiating his criminal case concurrently as Petitioner's case was progressing. Counsel's sworn statements and the factual media evidence resolves any refutation of a Conflict of Interest, * (see Exhibits #7 #10).

P.2

Petitioner factually proves that such Conflict of Interest existed and had an adverse effect on specific instances of Counsel's performance.
- Montreal v. State, 947 S.W. 2d 559, 564 (TCA 1997), Cuyler, 446 U.S. at 348-50, 100 S.Ct. at 1718-19.

Counsel's involvement in Conflict of Interest caused him to operate at a diminished capacity as he failed to investigate at all levels, failed to file proper motions to defend cause, lied and omitted key facts, and showed no efforts in supporting Petitioner's best interests.

Petitioner can factually show that the Counsel suffered from an actual conflict of interest, and conflict actually colored Counsel's actions during trial, Cadeluop v. State, 443 S.W. 3d 131, 136 (TCA 2014); Acosta v. State, 223 S.W. 3d 349, 356 (TCA 2007).

In U.S. v. Jiang, 140 F. 3d 124, makes it clear that a party having close involvement with a law firm causes a conflict, and in the case of Lace v. U.S., 736 F.2d 48, a conflict transpired where Counsel's brother had open issues with the same Prosecution.

Counsel's father was a member of his law firm, making Counsel a direct party of interest to the Prosecution, where in U.S. v. McCain, 823 F.2d 1457, 1463-64, shows where attorney was under investigation by the same prosecution team causes a Conflict of Interest, and in Armieti v. U.S., 234 F. 3d 820, the case was remanded for evidentiary hearing for conflict of interest; where Counsel had an open case with the same prosecution.

Petitioner shows substantial proof of a Conflict of Interest between the Petitioner, the Prosecution and Counsel's father, which affected the outcome of the trial. Strickland v. Washington, clearly states that [ANY] conflict of interest violates a criminal defendant's Constitutional rights, And when a criminal defendant is victim to a significant conflict of interest involving his lawyer, which altered any element to his case, the defendant is entitled to reversal of conviction, directed under the 6th Amendment.
- Strickland v. Washington, 466 U.S. 668, 80 L.Ed. 2d 674, also states that Counsel owes the client a duty of loyalty, a duty to avoid a conflict of interest, and is obligated to set his client's interests ahead of his.

Counsel knew precisely of his devised plan of favoring the prosecution, held a carefree demeanor, and proving not to agitate the very body transacting his father's cause. Counsel's father was a member of the Bonilla Law Firm, in which he partnered with his son, William Clayton Bonilla, attorney of record. The intimate father-son relationship and close involvement with law firm leaves no room to rule out any Conflict of Interest, especially with dual alliance present; Petitioner is entitled to relief, Ex-parte Acosta, 672 S.W. 2d 470 (TCA 1984)

P.3

**B.** _Ground Two:_ It would be _Counsel's duty to fully investigate_ all means of defense, and conclusively... "_leave no rock unturned._"

Counsel is strictly imposed of a stringent duty to investigate and make informed legal choices, only after investigation of all options, ideally investigating each line of defense substantially, and to make reasonable decisions that make particular investigating unnecessary.

* _Strickland v. Washington,_ 466 U.S. 668, 80 L.ed 2d 674.

As for this [witless] attorney, he clearly failed to up-end even the first rock. Counsel failed to investigate at all levels, made no real efforts to investigate, and relied solely on the Prosecution's charging instruments as his only directive, _making him ineffective._

* _Anderson v. Johnson,_ 338 F.3d 382 (5th cir. 2003).

_In Counsel's sworn affidavit,_ his statements are admission to his actions. He _clearly admits to only utilizing_ the State's investigative materials and charging instruments, proving ineffectiveness.

Counsel _did not seek_ other investigative measures, nor leave the State's perimeter, leaving him _ill-prepared_ to convey legal advice.

Reliance on State's investigation is ineffective, where exculpatory witnesses and exculpatory evidence existed. Counsel failed to call on any available witnesses, which would have had considerable benefits to the outcome of the case. Failure to call a witness may constitute as ineffective, provided the Petitioner can show (1) the witness was available, and (2) that the witness testimony would have benefitted the defense to the degree that the result of the trial likely would have been different, which both prongs would be true here for Petitioner.

* _Wilkerson v. State,_ 310 S.W. 3d 890, 894 (TCA 2010);
  _Perez v. State,_ 726 S.W. 2d 542 (TCA 1986);
  _Bryant v. Scott;_ 28 F.3d 1411, 1419 (5th cir. 1994).

A swift glance at the Police Reports and witness statements would have quickly signaled even the novice detective of contradictions and erroneous statements, that are plainly obvious and shamefully deceiving. Counsel's failure to investigate and pursue a defense is not reasonable.

* _Ex parte Flores,_ 387 S.W. 3d 626 (TCA 2012);
  _Ex parte Briggs,_ 187 S.W. 3d 458 (TCA 2005);
  _Gains v. Hopper,_ 575 F.2d 1147 (5th cir. 1978).

Benchmark for judging any claim of ineffective counsel must be whether counsel's conduct so underminded proper functioning of adversarial process that trial cannot be relied upon as having produced a just result, and must show that the counsel's errors resulted in actual and substantial disadvantage to the course of the defense.

* _Strickland v. Washington,_ 466 U.S. 668, 80 L.ed 2d 674.

p.4

• Not only was Counsel ineffective in all modes of his defense, but imprudently failed to perform any meaningful functions. Counsel <u>failed to file a "Morton Discovery Request"</u> to suppress the defective evidence and exert the exculpatory evidence in existance, which would have had an <u>elevated influence</u> on the outcome of the examination. Proceedings of a "Morton Discovery Request" are supported by the <u>Brady Act</u>, • <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), states that it is the prosecutions duty to surrender exculpatory evidence, in which Counsel did not pursue, and to date, <u>NO RESULTS HAVE BEEN SURRENDERED</u>, where <u>RESULTS EXCLUDE PETITIONER</u>.

A "Motion to Suppress Evidence" would have reasonably likely led to a different outcome, • <u>Jackson v. State</u>, 973 S.W. 2d 954 (CCA 1990); <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 106 S. Ct. 2574 (1986).

A denial by Counsel to suppress such evidence that holds reasonable probability that the outcome of the trial would have been different, violates the 6<u>th</u> and 14<u>th</u> Amend. rights, and entitled to relief.

C. <u>GROUND THREE</u>.   Counsel insisted that Petitioner plead out to this case, knowing fully that Petitioner was claiming he was innocent. Against his wishes, Counsel pursuaded Petitioner to plead out, so to advance in a separate, personal matter, <u>COERCING A GUILTY PLEA</u>.

Coercion was a direct influence from the Conflict of Interest, which affected Counsel's performance, • <u>Lopez v. Scully</u>, 58 F. 3d 38; <u>Mickens v. Taylor</u>, 535 U.S. 162, 152 L. Ed. 2d 291 (2002), which rendered plea involuntary and unknowingly.

<u>Counsel coerced Petitioner to make a plea of guilty</u> by demonstrating an erroneous document having an examing date of approximately a year later (see <u>Exhibit # 21</u>) filed by previous Counsel, and stated it was the earliest trial judge would consider, and Petitioner would be jailed until then, without a bond. This document, <u>Exhibit #21</u>, displayed a simple clerical error in the date, unknown to the Petitioner at the time, but Counsel used it to his advantage to pursuade Petitioner to plead out. This document was later recovered from a requested copy of file.

On the basic and obvious level, a Petitioner's guilty plea must not be a product of direct, active coercion, which violates the 6<u>th</u> Amendment, • <u>Boykin</u>, 395 U.S. at 243, 89 S.Ct. at 1712.

Counsel also made false promises of having a deal with the Prosecution in keeping the option open to appeal. After the trial concluded, a "Notice of Appeal" was filed, pro se, prior to having knowledge of the erroneous deal, and was ultimately denied, • (see <u>Exhibits #14 and #20</u>).

AFTER the denial of the "Notice of Appeal" and "Motion for New Trial" (Exhibit #4), Petitioner became fully aware of the damage the Counsel caused; due from his erroneous statements of having a deal with the Prosecution in keeping the option open for Appeal, *(see Exhibit #23).

Counsel has a duty to (1) give accurate information when information is given, And (2) in some circumstances, give a client advice without being prompted to, • Ex parte Moody, 991 S.W. 2d 852 GCA 1999).

"Petitioner pleaded out [only] because he trusted Counsel's Advice," stating that Appeal's process was a quicker remedy, which he ill-advised, of it only being a (30)day process. Bad Advice Renders Counsel ineffective, • Moore v. Bryant; 348 F.3d 238 (2003).

Plea was not simply involuntary and unknowingly, but instead... [vigorously coerced] by Counsel's [toxic effects] of rescuing his disbarred-attorney-father from the cruel confinements of prison, *(see Exhibits #6 to #11).

A defendant's decision to plead guilty when based on erroneous advice from Counsel, is not done voluntary and knowingly; but instead, coerced, • Ex parte Moussazadeh, 361 S.W. 3d 684 (GCA 2012), And official coercion can render a plea constitutionally invalid, as it may overcome the voluntariness of a defendant's plea,
• Fontaine v. U.S., 411 U.S. 213, 93 S.Ct 1461 (1973), where any error is considered to lay prejudice, if absent these errors, the outcome would have been different,
• Strickland v. Washington, 466 U.S. 668, 8L. Ed 2d 674; but for Counsel's poor advice, Petitioner would not have pleaded guilty; but would have proceeded to trial, as he wished.

The United States Supreme Court held that Counsel maybe found to have been Constitutionally ineffective for giving poor advice to a client regarding whether to "Accept or Reject a plea,"
• Lafler v. Cooper, 132 S.Ct 1376 (2012)

Petitioner proves "by the preponderance of the evidence" of Counsel's ineffectiveness, which legally entitles him to relief.

D. Ground Four: Counsel "Obstructed Justice" as he disrespected the "Rule of Law" as he consciously and intently [deceived] Petitioner in efforts of advancing his own interests, above those of his clients; Counsel owes the client a duty of loyalty, a duty to avoid a conflict of interest,
• Strickland v. Washington, 466 U.S. 668, 80 L. Ed 2d 674.

To pursuade one with false and erroneous material in efforts of compelling him to act at a disadvantage, is clearly defined as "COERCION," violating a defendant's 6th Amendment right to a loyal and effective counsel.

All evidence at hand, clearly demonstrates Attorney's deeds of coercion and obstruction of justice, as he attempted to rescue his father from the cruel confinements of prison, by consciously deceiving Petitioner, having no regards to his welfare. When Counsel coerces his client to a plea of guilty, such display causes a "Conflict of Interest," which affects his over-all performance, and in this matter, so upset the Adversarial balance of this prosecution, rendering it Constitutionally intolerable, · WEEKLY V. JONES. 56 F. 3d 589;

Mikens v. Taylor, 535 U.S. 162, 152 L. Ed 2d 291 (2002).

On a basic and obvious level, a defendant's guilty plea must not be a product of ACTIVE, direct coercion,
• Boykin, 395 U.S. 243. 89 S.Ct, 1712. In which it would [NOT] be unreasonable to cite that Counsel would perform such acts, as his law firm holds a "colorful history" of Deception and Obstruction of Justice, * (see: Exhibits #5 to #11).

E. GROUND FIVE: The Prosecution misconducted when they knowingly labored under a "Conflict of Interest." Counsel's Father's [High Profile] criminal case was broadcasted widely by the media and was a well-known subject matter in the Nueces County Courthouse, * (see: Exhibits #5 to #11).

Prosecution was wrongly positioned and reckless in avoiding such conflict, and held no restraint when negotiating both cases in unison.

Prosecution was negligent in correcting this issue, that would weigh greatly on the outcome of this cause, violating Petitioner's 6th and 14th Amendment Rights.

The burden is on the Petitioner to prove his case, showing a true conflict of interest, by a preponderance of the evidence.
• Odelugo, 443 S.W. 3d at 136-137.

Petitioner proves substantially of a "Conflict of Interest" between Petitioner, Prosecution, and Counsel's father. This Conflict actually colored the outcome of trial, rendering it unconstitutional.
• Prosecution further misconducted when exhibiting unethical behavior, as they referred Counsel to Petitioner to be hired to work the case. These unlawful acts violate Petitioner's 6th and 14th Amendment Rights.
• Strikland v. Washington. 466 U.S. 668, 80 L. Ed 2d 674, clearly states that [ANY] Conflict of Interest violates Constitutional rights, and is entitled to Relief under the "Automatic Reversal" of conviction Rule, • U.S.C.A. Const. Amd. 6.

F. Ground Six: Prosecution's duty to notify the Petitioner of any exculpatory evidence is NOT a discretionary matter, but rather a legal obligation to produce such material, EVEN WITHOUT REQUEST.

With-holding any exculpatory evidence is a direct violation of Petitioner's 14th Amendment right to due process of law. To date, Prosecution [Refuses] to turn over DNA results that [Exclude] Petitioner.

DNA laboratory services were ordered by investigative officers requesting an analysis for [the presence of or the absence of the suspects DNA], * (see: Exhibit #1, #2, and #3). Prosecution clearly misconducted when they failed to produce and pursue exculpatory evidence, violating due process of law.

All witnesses had known "Fred" from a prior engagement and well aware of his name, and had no reason to refer to suspect to anything else, than his name. Witnesses clearly exhibit their knowledge of Fred not being the person in question, by excluding him in their final sworn statements, after sobering up from alcohol intoxication.

Prosecution evaded their duty to pursue these imposing exculpatory details in the sworn witness statements, which distinctively exclude Petitioner's name in all formal declarations, * (see: Attachment #2 - p.3.5, p.21 and p.22).

In Brady v. Maryland, 373 U.S. 83 (1963), states that the Defense is entitled to receive ALL information from the Government that could show the Defendant's innocence, and that could be used for impeachment. Prosecution must not with-hold material evidence and shall surrender it without request. Stickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936 (1999).

Prosecution failed to reveal material that excluded Petitioner and would have been favorable to his defense, to which the results would have been different, Smith v. Cain, 132 S.Ct. 627 (2012), shows where conviction was overturned. Petitioner is entitled to relief.

G. Ground Seven: Prosecution misconducted when they employed evidence known to be defective to secure this conviction, which violates the Petitioner's due process of law rights, guaranteed by the 14th Amend. of the U.S. Constitution, Turnbow v. Beto, 309 F. Supp. 957.

The State may not put on testimony or evidence which is known by the State to be materially false, which violates the 14th Amendment, to due process of law. Substantial error requires reversal of conviction, Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763 (1972).

p.8

Petitioner provides substantial proof of defective evidence, to include:

(1) Perjured Police Reports - * (see: Attach. # 1 and # 2).

(2) False Witness Statements — * (see: Attach. # 1 and # 2).

(3) Illegally Obtained Suspect Line-up - *(see: Attach. # 2 p. 12,7)

(4) Deceptive Statements- Alleged Victim -*(see: Attach. # 1 p.35 and p.116,2)

The law is clear that a conviction or sentence procured through the use of false testimony or evidence, even if unknown at the time, results in denial of due process of law, guaranteed by the 14th Amend., which directs to set aside any such defective evidence;
  ° Ex parte Ghahremani, 332 S.W. 3d 470, 477 (CA 2011);
    Ex parte Chabot, 300 S.W. 3d 768, 771 (CA 2009).

The State cannot introduce into evidence the results of a line up procedure, which was unduly suggestive and prejudicial, and therefore, unreliable, which violates due process of law, where defective evidence is present, directing to set aside any such evidence;
  ° Bloodworth v. Hopper, 509 F. 2d 1382 (5th Cir. 1976);
    Simmons v. U.S., 390 U.S. 377, 88 S. Ct 967 (1968).

• Police performed an official suspect line-up, out in the field, out of the preservation of the Police Station, to be conducted to procedural standards. Line-up was illegally conducted on a dark parking lot, at the beach, consisting of only [two] individuals, embodying only one white male and one Hispanic male, * (see Attach. # 2 p. 20,13), violating 4th Amend.

• Police Reports show clear and convincing [Acts of Perjury] as narratives by all four responding officers demonstrate foul efforts of building an authentic case against Petitioner, "Tejeda v. Dubois, 142 F 3d 18; Tomy v. Gemmon, 79 F. 3d 693, in which many details and statements are simply not marginally unconforming, but excessively contradictory in nature, a proves to have been constructed in a deceptive style, in which must be excluded, including witness's false statements. False testimony is "material," and supports reversal of conviction.
  ° Rodriguez v. Quarterman, 535 F. Supp. 2d 820, 327 Fed App x 466.

• The Alleged victim proves to be untruthful at first hand, and then only days later, shows deception, forgetting his rehearsed statements.

If alleged victim's statements are uncandidly deceptive in nature, and unreliable, must be be set aside, ° Barrell v. Crouse, 468 F. 3d 648.

This case holds an erroneous identification procedure which resulted in irreparable damage, and thus, entitled to relief; ° Disparra v. Lynaugh, 847 F. 2d 211; Guerra v. Collins, 916 F. Supp. 620, 90 Fd. 1075.

P. 9

**H.** GROUND EIGHT: • Prosecution further misconducted when they failed to correct issues to be defective. The evidence held numerous errors in the Police reports, witness statements and alleged victim's statements, which are undoubtedly misleading in nature, *(see: Attach.#1 and #2).

• Prosecution failed to correct their involvement in the Conflict of Interest. This conflict was not merely a slight transgression, but an extensive discord, being obvious and transparent, which clearly affected the outcome of the trial.

• Prosecution continues to evade their duty to surrender DNA results, serving as exculpatory material, which excludes Petitioner, in violation of the Brady Act, as they also failed to pursue any of the exculpatory witness statements, *(see Attach.#2-p.21 and p.22).

A violation of due process may arise not only through the use of false testimony or evidence, specifically elicited by the State, but also by the State's failure to correct the instruments known to be false. Whether the Prosecution actually knows the evidence to be false, or not, is not necessary to decide, rather, it be enough that they should have recognized the misleading nature of evidence, that would burden the outcome of the truth.

    • Napue v. Ill., 360 U.S. 264, 269 (1959);
    Pyle v. Kansas, 317 U.S. 213 (1943);
    Mooney v. Holoban, 294 U.S. 103 (1935).

**I.** GROUND NINE: Prosecution breached the requirements of a Plea Contract, as they transacted the trial with no agreement to conditions of a plea. This plea of guilty was unknowing and involuntary, in which [NO SIGNATURE] is present on the proposal, clearly proving of no agreement of acceptance was satisfied prior to final judgement, invalidating the contract. Even one deviation from literal requirements of a plea agreement is a reversable error. *(see Exhibits #15 and #17).
    • Fed. Rule Crim Proc. Rule 11. 18 U.S.C.A.
    • U.S. v. Kahn, 588 F.2d 1964, (GCA 1979).

Pleas of guilty are presumed to be adequately voluntary, but Petitioner has overcome proving his burden, by the preponderance of the evidence, of violations, • Ex parte Wilson, 716 S.W.2d 953 (GCA 1986).

Petitioner did not understand consequences of plea and involuntary. • Boykin v. Alabama, 395 U.S. 238, 89 S.Ct 1709 (1969), which rendered plea not knowing and not voluntarily made, because plea was not properly developed.

P. 10

J. **GROUND TEN:** PROSECUTION presents NO substantial evidence to support an element of a crime, and denies Petitioner due process of law, violating the 14th Amendment to the U.S. Constitution.

 *Ex parte Barfield*, 697 S.W. 2d 420 (TCA 1985); *Ex parte Perales*, 215 S.W. 3d 418 (TCA 2007), clearly states that a defendant may have a meritorious claim, if he can show that there was NO EVIDENCE ON A CRUCIAL element of the offense, with which they were convicted, EVEN AFTER A PLEA OF GUILTY WAS ENTERED. *(SEE: Attach. #1 and #2); Also, (SEE: Exhibits #1, #2 AND #3).

 The State has been found to have NO PROOF of an element of a crime and no true evidence whatsoever. All evidence introduced to support this conviction has been discovered to be legally deficient. If the State has produced no proof of an element of a crime, the Petitioner may be entitled to habeas corpus relief.
 • *Ex parte Reed*, 402 S.W. 3d 39, 44-46 (TCA 2013).

 In requiring the State to introduce evidence showing a defendant's guilt, Legislation intended that NO PERSON would be convicted on his plea ALONE, without evidence introduced [sufficient] to show guilt of the accused. • *VERNON'S ANN. C.C.P.- Art. 1.15*,
 *Fitzsimmons v. State*, 471 S.W. 2d 858 (TCA 1971),
"Sufficient Evidence" meaning; Material evidence "FREE of DEFECTS", that hold significance to the cause, where plea of guilty is before a court, State must introduce [sufficient evidence] to show guilt. • *Crawford v. State*, 278 S.W. 2d 845 TCA (1955).

K. **GROUND ELEVEN:** Trial Judge knowingly tolerated parties to conduct business under a "Conflict of Interest." Counsel's father's [High Profile] CRIMINAL CASE was widely broadcasted by the media and was a well-known subject matter in the Nueces County Court house, which was merely impossible for Judge to ignore, *(see Exhibits #5 to #11).

 Judge was reckless in avoiding such conflict to operate, and further, neglected to correct this issue that burdened the outcome of trial.

 Judge should have [NOT] tolerated this trial to have co-existed, as Counsel's father negotiated his criminal case, with the same Prosecution, and in the same Courthouse.

 • If a District Court ignores a possible "Conflict of Interest" of trial counsel and does not conduct initial inquiry, REVERSAL of the Petitioner's conviction is "Automatic". • *U.S.CA. Const. Amend. 6*,
 • *Cuak v. U.S.*, 59 F. 3d 307; *U.S. v. Lussier*, 71 F. 3d 456, 461.
 No record of inquiry exist; Petitioner is entitled to relief.

L. Ground Twelve: Petitioner effectively put the trial Judge on Notice of defects and promptly petitioned for a new, unbiased trial, but was denied fair consideration, * (see Exhibit #4).

Petitioner may, within 30 days after trial, which sentence has been imposed or suspended, move for a new trial by stating grounds specified in the Rules of Appellate Procedures,

• Rule App. Proc. Rules 30, 33; State v. Evans, 817 S.W. 2d 807.

The 6th Amendment to the U.S. Constitution guarantees the Right to a "fair and full" trial. Petitioner discovered judicial injustices At the preliminary stages of this case and had an immidiate outcry of "foul-play."

Petitioner has requisite standing to raise equal protection,

• Cambell v. Louisiana, 523 U.S. 399, 140 L.ed. 2d 551, 118 S.Ct. 1419.

• Strickland v. Washington, 466 U.S. 668, 80 L.ed. 2d 674, strongly supports the merits of the 6th Amendment, which protects Against An unfair, imbalanced tribunal, and the 14th Amendment protects Against violations of due process of law.

---

Petitioner provides substantial proof, by a preponderance of the evidence, of U.S. Constitutional violations, which entitle him to unconditional relief under the "Automatic Reversal" rule for Remediation of the conviction, to include:

(1) State's violation of Brady Act for failure to turn over exculpatory evidence.

(2) Trial Courts failure to initiate inquiry of a possible conflict of interest of trial counsel, and further, was entirely ignored.

(3) Prosecution's use of perjured police reports and false witness statements.

(4) Prosecution's use of illegally obtained evidence of suspect line-up.

(5) State has no proof of an element of a crime.

(6) Substantial Conflict of Interest involving Petitioner, State and counsel.

(7) State's deviation of plea agreement requirements.

All is held in the State's Record and verifiable, entitling Petitioner to unconditional relief.

---

I, Fred G. Martinez, declare under penalty of perjury that the foregoing is true and correct.

Executed on the 1st day of August        2018.

2061834
TDCJ #

Fred G. Martinez-Petitioner

P. 12

Item

(3). = 11 pages

## Attachment # 1

Defendant's Examining
Results of

## Attachment # 2

Cause # 14-CR-2389-B

# Defendant's Synopsis

After thorough examination of all police reports and witness statements, I have discovered errors that had been disregarded at first hand. Careful review and meticulous comparison of all reports has revealed comprehensive, illicit police practices.

Four responding officers file four very different statements as components of the evidence, which are notably contradictory in nature. These declarations were keenly altered, and are clearly acts of perjury, which is unlawful in the eyes of the law. These statements were jointly collaborated in efforts of building an authentic crime against a suspect.

I have also found that the witnesses falsely implicate the defendant. As the police wrongfully suspect Martinez and demonstrate a classic case of mistaken identity. This case holds no creditable testimony from any accuser and they clearly show to exclude Martinez in their final sworn statements. Furthermore, there is no solid physical or forensic evidence to uphold a rigid argument.

Admitted in the following documents, you will find reliable evidence of defendant's innocence, which rules out speculations and reconstructs this case from a mere circumstantial matter, into a rigid evidencing case in favor of and instrumental to the defendant's innocence.

The following material and by the preponderance of the evidence, the Defendant's Synopsis shall yield sufficient proof of his innocence

## I.

Call for Service- Blotter: female is wanting an officer at her location due to her son being sexually assulted approx. 10 mins. ago son age 12. male hispanic 5'1" assulted son. male will be in vehicle with SPURS flag next to american flag pirate flag. complainant in an f-150 tan in color with hazards lights on. white building hotel.

＊(see Attachment #2 - p. 1)

p. 1

p. 2.2 - <u>DISCREPENCY #3</u> - statement: The Mother gave an accurate discription of Martinez.

p. 1.2 - <u>Detail #1</u>: Discription given was of someone being <u>5'-1"</u> and restated this detail on p. 3, p. 4, p. 5, p. 23 and p. 25.

<u>Fact #1</u>: Martinez is in fact <u>5'- 5"</u>

<u>Fact #2</u>: Arrest report clarifies hight of <u>5'-5"</u> (p. 12)

<u>Fact #3</u>: Sgt. Hannon's Report (p. 3.2) clearly denotes the error.

---

p. 5.6 - <u>Detail #2</u>: Mother reports suspect being medium built (p. 5.6 and p. 23), but Steve reports the suspect being skinny (p. 6.5 and p. 25).

<u>Fact</u>: Martinez is in fact <u>162-lbs</u> and small built (p. 2.1).

---

p. 23 and p. 25 - <u>Detail #3</u>: Mother and brother both report of suspect being clean shaven.

<u>Fact</u>: Arrest photo shows Martinez having facial hair.
                                        * (SEE EXHIBIT #22)

---

p. 2.2 - <u>Discrepency #4</u>: statement: Mother and Brother made a positive I.D.

<u>Detail</u>: "A field I.D." of suspect conducted (p. 12.7, p 19.4, p 2⁰)

<u>Fact #1</u>: Officers conducted an official suspect line-up.

<u>Fact #2</u>: Practice was overly suggestive in nature.

<u>Fact #3</u>: Practice is considered illegal.

<u>Argument</u>: An official suspect line-up was illegally conducted on a dark beach parking lot with only 2 individuals, consisting of one white male and one Hispanic male. Line-up was overly suggestive, with only one Hispanic suspect to choose from.

P. 3

## III.

## Investigative Report by Sgt. Mike Hannon

p. 3.2- <u>Detail #1</u> - statement: A 5'-1" Hispanic male in a vehicle with <u>a SPURS flag.</u>

p. 1.2 - <u>Blotter:</u> male Hispanic 5'-1" in vehicle with SPURS flag.

## Contradictions

p. 3.3- <u>Sgt. Hannon</u> contradicts details when he states that Soto reported Fred was in a "White SUV," when in fact, the call for service Blotter p.1.2 only states— "A vehicle with <u>a SPURS flag</u>"

p. 3.2- <u>Sgt. Hannon</u> denotes the error of the suspect's height being 5-5," not 5'-1."

p. 3.3- <u>Sgt. Hannon</u> states that Soto said the vehicle was "White," when in fact, Soto NEVER specified color.

p. 12.2- <u>Ofc. Joseph Rivas</u> reports that Soto stated Martinez was in a "White SUV," but communications proves otherwise.

p. 17.1- <u>Ofc. Lance Sanders</u> reports that Ofc. Joey Rivas informed him of a "Hispanic male <u>DRIVING</u> a white vehicle," yet NO one else was advised of a suspect "DRIVING," nor does Ofc. Rivas EVER show to report this detail.

p. 17.2- <u>Ofc. Lance Sanders</u> reports that Ofc. Rivas also advised him that the hood of the vehicle was supposed to be up, but Ofc. Rivas' radio communications does not reflect this detail, nor any other officer ever report being advised of this detail. Also, no officer ever reports seeing the hood being up in the suspects vehicle. Witness reports do not reflect to have said such detail.
✗ Ofc. Sanders made up that detail, after he discovered suspect's vehicle was inoperatable, and not "DRIVING."

p.4

p. 17.2 - Ofc. LANCE SANDERS asks over the radio, at the time of contact with the suspect, if it was an SUV that he was supposed to be looking for, but was advised by Ofc. RIVAS that "it could possibly be an SUV" which shows uncertainty at the time of contact with the suspect.

p. 17.1 - Ofc. Sanders clearly states previously that he was informed by Ofc. RIVAS that this detail was factual.

p. 20.2 - Ofc. Stephen Flores reports that Ofc. RIVAS advised all units the suspect vehicle was "a white SUV," prior to responding to the call, and confirms to all units that the suspect vehicle was "a white SUV," which suggests RIVAS was sure of this detail prior to contact with suspect, yet no radio communication reflects "a white SUV."

p. 19.2 - Ofc. JASON ATWATERS reports that he was given a discription of a HISPANIC MALE APPROX 5'-5" with a dog in a white SUV, prior to contact with suspect. No other officers reports ever state any details of a dog. Witnesses never gave such details. No report was ever broadcasted of suspect being 5'-5" or in an SUV prior to coming in contact with suspect.

   * Ofc. Atwaters, fabricated this detail after he came in contact with MARTINEZ and witnessed him having a dog.

Argument: After careful review and comparison of all police reports, a discovery of illicit police practices are clear. Police officer's actions and behaviors here are unethical, and clearly unlawful. Details were materialized ficticiously, in efforts of building an authentic crime.

p.5

p. 3.4 - <u>Detail #2</u> statement: Soto told Ofc. Rivas she didn't witness the sexual contact.

    p.12.3 - Soto says she didn't witness the incident.

<u>Contradictions</u>

p. 17.4 - Soto states she was pretty sure that Fred was the man who ~~touched~~ her son.

p. 4.3 - they could positively identify the man that touched Colby's genitals.

  <u>Fact</u>: Both witnesses exclude "Fred" from their sworn statements (p. 21 and p. 22).

  <u>Fact</u>: The alleged victim claims it was "a man." (p. 3.5).

  <u>Fact</u>: All witnesses and alleged victim knew the suspect by his name. No reason to phrase Fred anything else, but by his name.

<u>Argument</u>: On (p. 21) Soto states "the suspect" touched Colby multiple times, while she was looking for a lighter in her truck, but didn't witness any of these incidents (p. 3) in the 5 minutes she was looking for a lighter. (p. 4)

     Steve also claims he was present, but didn't witness any crime take place either, although they both claim to be in close proximity to Colby, yet they both swear a crime occured.

     Police claim 9 y.o. Alex wasn't a victim, and he isn't a witness either, but no details are given of his where-abouts, as if he didn't exist.

<u>Theory</u>: Both witnesses, Sara and Steve, did write their final sworn statements hours later, after they had sobered up from alcohol intoxication, and relize Fred was not the person in question and exclude him as the suspect. (p. 21 and p. 22).

p. 6

p. 3.4 - <u>Detail #3</u> - statement: Soto stated the incident occured around her truck while looking for a lighter.

<u>Contradiction</u>

p. 6.3 - Steve claims it happened in the tent as he was with his mother at the restrooms.

---

p. 3.4 - <u>Detail #4</u> - statement: Fred initially approached Colby asking for a lighter.

<u>Contradictions</u>

p. 5.4 - Sara states that Colby was in the tent when Fred came over and asked for a lighter, and she searched her truck, insinuating Fred asked her.

p. 6.2 - Steve was in the tent, but heard someone outside talking to Sara. He and Colby got out of the tent. Steve claims Fred asked Sara for a lighter.

p. 21 - Soto only states that "a suspect" walked up to our vehicle and asked for a lighter, but now excludes Fred from her sworn statement and doesn't mention Colby's where-abouts.

---

p. 3.4 - <u>Detail #5</u> - statement: Soto stated that Fred walked back towards his vehicle after she was unable to find a lighter.

<u>Contradictions</u>

p. 3.7 - Steve says he saw Fred still standing near their vehicle about 60 feet away, and walked over to him and made him leave.

p. 5.4 - Soto states that Fred walked away.

p. 5.4 - Soto now claims she saw Fred hiding behind a truck about 500 feet away.

p. 21 - Soto claims "suspect" simply left (in her sworn statement).

p. 22 - But now Steve claims he walked "the Guy" back to his camp area after the alleged incident, (in his sworn statement), and excludes "Fred" from his final statement.

P. 7

p. 3.5 - <u>Detail #6</u> - Statement: Colby says," <u>A MAN</u> ASKED ME if I wanted to make a hundred dollars, he touched me in the private area, and he made me touch him in the private area."

p. 5.1 - No statement was obtained from Colby at the police station.

p. 11.2 - Colby openly and freely states at the advocacy center that Fred touched him on his "privates" "where he pees" and vise-versa. He was then asked if Fred said anything to him, and he told her "it was personal," but he had told a police-man days before.

<u>Argument:</u> Colby initially stated of the 100 dollars at the beach, but never repeats this detail again. The statement of a man asking him if he wanted to make a hundred dollars doesn't seem quite personal as Colby states, but the details of someone touching his privates and he touching someone else's privates would absolutely be a personal issue that should have made him hesitant to speak openly and freely about. Colby is clearly being deceptive.

<u>Theory:</u> Colby was initially lying as coerced, but now has forgotten what he was supposed to say days later at the advocacy center.

p. 3.6 - <u>Detail #7</u> - Statement: Colby got inside the truck and Soto asked him if he wanted to leave. He said yes, then she went to the restroom, and he stayed in the truck.

<u>Contradictions</u>

p. 5.4 - Soto told Colby to go into the tent and zip it up, went to the restroom, came back from the restroom, and then she asked him if he wanted to leave, while he was in the tent.

p. 5.5 - Colby is in the truck and wanted to go home.

p. 6.5 - Sara told Steve to go to the tent and take care of Colby while she went to the restroom.

p. 8

p. 3.6 - DETAIL#8 Statement: Soto went to the restroom where her 18 year old son was and told him what happened!

Contradictions

p. 5.4 - Soto told Steve what happened, told him what happened at the camp and told him to watch his brothers, and she quickly went to use the bathroom near the campsite.

p. 6.2 - Steve said Sara asked him to walk her to the restroom, and that was when Fred touched his brother.

Argument

Soto claims a child sexual preditor attacked her son, but then leaves him alone, unattended with the suspect, to go to the restroom, where her oldest son is at, and then she finally decided to call police after she uses restroom.

She also fails to mention about where her other son, Alex - 9 y.o., is at during and after these multiple assults.

Questions

• Who in their right mind is going to leave a 9 y.o. and a 12 y.o. with a child preditor, after claiming he just sexually assulted one of them, multiple times?

• Who leaves their children, with no other adults around, as she claimed, with a child preditor, just to use the restroom?

• Who delays calling police, just to use the restroom?

• Who in their right mind is going to use the restroom a distance away from camp, and leave their minor children with a child sexual preditor in a dark beach, after claiming one child was crying, because he had been attacked multiple times seconds before?

p.9

p. 3.7 - <u>Detail #9</u> - statement: Steve said he saw Fred still standing near their vehicle about 200 feet away, after his mom told him what happened, so he walked over to Fred and made him leave.

<u>Contradiction</u>

p. 3.4 - Soto claims Fred walked back towards his vehicle, but doesn't mention if her 18 y.o. son asked Fred to leave or if he walked Fred back to his camp, as Steve claims.

p. 5.4 - Soto claims Fred walked away.

p. 5.4 - Soto now claims she saw Fred hiding behind a truck about 500 feet away, clearly a distance away from his vehicle, but no details of seeing Fred going back to his vehicle, or who's truck he was hiding in.

p. 21 - Soto simply states that Fred left.

p. 22 - Steve clearly states in his sworn statement that "A Guy" was around his mom's truck and ... then he walked the guy back to his camp area after the alleged assults.

<u>Argument</u>:

The two people who claim to be the most creditable witnesses, seem to have multiple conflicting statements of the suspects actions and visual placement.

<u>Fact</u>: Martinez was asleep in his vehicle as police clearly claim to have found him (p. 42) and didn't commit any crime. Police never investigate the person Soto claimed was hiding behind a truck 500 feet away. (p. 5.4)

<u>Martinez is innocent and wrongfully accused.</u>

p. 10

# Defendant's Conclusion

After careful comparison of all statements, it would be safe to conclude that Fred Martinez did not commit the alleged crime and most probable, the stated crime was never acted by anyone.

Witnesses have conflicting statements and police clearly show to have materialized many details.

It is quite odd to discover that Colby (alleged victim) states it was "a man" (p. 3.5). Steve's sworn statement (p. 22) also clarifies multiple times that it was "a guy." Soto's sworn statement (p. 21) never mentions Fred's name. Nine y.o. Alex did not give a formal statement, because police claim he was not a witness to the incident. "Alex is clearly a credible witness." He absolutely witnessed NO crime take place, just like everyone else, and being at the alleged crime scene only feet away from Colby.

The alleged victim and the two most creditable witnesses had full knowledge of the suspects name, but all official witness statements clearly abandons any implications of Fred's name. The two sworn statements take presidence over any previous statements and they both clearly exclude Martinez.

The fatal errors exhibited by these parties led to a flawed case and ultimately a wrongful conviction. Not only does the defendant confirm the Prosecution's lack of substantial evidence required to uphold a conviction, but shows to have affirmative proof to satisfy the required elements to validate his innocence.

8-1-18
_____
Date

Fred G. Martinez, Defendant

P. 11

Item

(4) = 26 pages

## Attachment #2

- Police Reports
- Witness Statements

Cause #  14-CR-2389-B

pg. 1 of 26.

## CALL FOR SERVICE

7/16/2014

| Agency | A | Port Aransas Police Department | | Incident # | 201400011398 | | Case # | |

### VEHICLE

| Suffix | 01 | Plate | 04RCG9 | State | TX | Make/Model | Ford |
| Year | 2001 | Color | BGE | | | Occupants | |

Description
Street/Dir
Other
VIN          1FTZX1727INA85939

**Transport**                                                          Suffix

| Unit | Miles | Start | | End | | Tot |
| Patient | | | | Type | | Sex |
| Reason | | | | Care | | |

**Blotter**

1332
female is wanting an officer at her location due to her son being sexually assaulted approx 10 mins ago son age 12. male hispanic 5'1 assaulted son. male will be in vehicle with SPURS flag next to american flag/ pirate flag. complainant in an F150 tan in color with hazards lights on. white building hotel

4332
0210 arrested 1 male for Indecency of a child

4253-not for distribution

**Log**

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 7/6/2014 05:38:56 | 0000133 | April Zambrano | 2210 going to 1a |
| 7/6/2014 05:39:57 | 0000133 | April Zambrano | ferry notified |
| 7/6/2014 05:41:20 | 0000133 | April Zambrano | 2221 beach st to jetty no vhicle matching description |
| 7/6/2014 05:43:45 | 0000133 | April Zambrano | saspect is in 2223s area |
| 7/6/2014 05:44:24 | 0000133 | April Zambrano | directly infront of sines condos with male in vehicle |
| 7/6/2014 05:44:35 | 0000133 | April Zambrano | victim is at pole 4 |
| 7/6/2014 05:48:57 | 0000133 | April Zambrano | possible vehicle with the tag AF73031 sitting at Travel lodge |
| 7/6/2014 05:49:29 | 0000133 | April Zambrano | 2220 has hispanic male in vehicle moving around |
| 7/6/2014 05:57:09 | 0000133 | April Zambrano | 2220 martinez subject getting defensive |
| 7/6/2014 05:59:48 | 0000133 | April Zambrano | field ID |
| 7/6/2014 06:08:56 | 0000133 | April Zambrano | 2 positive IDs |
| 7/6/2014 06:10:36 | 0000133 | April Zambrano | 95x1 |
| 7/6/2014 06:10:58 | 0000133 | April Zambrano | Martinez |
| 7/6/2014 06:13:35 | 0000133 | April Zambrano | 2210 enroute to PD with 2221 |
| 7/6/2014 06:15:30 | 0000133 | April Zambrano | side lot |
| 7/6/2014 06:34:25 | 0000133 | April Zambrano | Incident Closed |
| 7/6/2014 06:40:01 | 0000133 | April Zambrano | 2223 enroute with victim and victim mother |
| 7/6/2014 06:40:37 | 0000133 | April Zambrano | to PD |
| 7/6/2014 17:56:54 | 0000130 | Mark David Fuentes | Incident Re-Opened |
| 7/6/2014 18:20:18 | 0000130 | Mark David Fuentes | Incident Closed |

Pg 2 of 26

## NUECES COUNTY SHERIFF'S OFFICE FIELD ARREST REPORT
## AFFIDAVIT OF PROBABLE CAUSE

NCSO TRN# _____   SID# _____   DPS# _____

OFFENSE# 1400 3810   ARREST TIME 0610   ARREST DATE 07/06/2014

Name   Fred Martinez                        Alias _____

Address   1015 El Dorado St, San Antonio, TX 78225   DOB  02/18/1974   Race  H   Sex  M

POB   TX   Age  40   Hair  BLK   Eyes  BRO   Hgt.  505   Wgt.  162

DL#  00737618   ST.  TX   SSN  453374221   KIN _____

Arrest Location   230 N On The Beach, Port Aransas, TX 78373

Employer _____   Vehicle _____   Yr. _____   LP _____

Wrecker _____   Location _____

| | P.C.# | CHARGE | OFFENSE DEGREE | WARRANT# | FILE DA/MC/JP/OJ |
|---|---|---|---|---|---|
| 1. | 22.11(a)1 | Indecency with a Child. Sexual Contact | F2 | | DA |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

NARRATIVE: Dispatch received a 9-1-1 call in reference to a sexual assault that occurred on the beach with a 12 year old minor. I located the victim and his guardian. The guardian stated the suspect is in his vehicle, and gave a description of a white SUV. The suspect Martinez, was located approximately 250 feet from where the incident occurred. The victim made an outcry of the sexual contact immediately after the incident occurred to his guardian. Martinez was the only person around the victim moments before it occurred. The mother, and the older brother made a positive identification of the only person, who was around the victim at the time of the incident occurred, which was Martinez. The mother gave an accurate description of the vehicle, and Martinez prior to making a field identification. Fred Martinez, engaged in sexual contact with a minor by touching the genitals through the clothing. Therefore he was placed under arrest for the sexual contact.

| Arresting Officer | | | Transporting Officer | | |
|---|---|---|---|---|---|
| J Rivas | 2223 | PAPD | M Ponder | 2215 | PAPD |
| Name | Emp.# | Agency | Name | Emp.# | Agency |
| | | PAPD | | | PAPD |
| Name | Emp.# | Agency | Name | Emp.# | Agency |

BEFORE ME, the under authority, on this day personally appeared   Joseph Rivas_____ , who after being duly sworn, on oath says that he has good reason to believe and does believe that on or about the   6   day of   July   , the above arrested person did then and there commit the above listed the above facts and circumstances contained on this arrest sheet and any attachments prepared by the named arresting officer who is a sworn peace officer.
SWORN TO and signed before me by   Joseph Rivas   , on this   6   day of   July

STATE OF TEXAS
COUNTY OF NUECES

ANNA MARIE GONZALES
Notary Public, State of Texas
My Commission Expires
March 11, 2015

Anna Marie Gonzales
Notary Public, State of Texas

Pg. 3 of 20

**Investigative Report – Port Aransas Police Department Case 201400011398**

| | |
|---|---|
| **Investigator:** | **Sgt. Mike Hannon** |
| **Offense:** | **Indecency with a Child** |
| **Date/Time:** | **07/06/2014, 5:37 AM** |
| **Location:** | **230 N On the Beach, Port Aransas, TX 78373** |
| **Victim:** | **Colby Christy (dob 08/06/2001, 12 y/o)** |
| **Offender:** | **Fred Martinez (dob 02/18/1974, 40 y/o)** |

**Initial Call – Patrol Report**

On 06/06/2014 at 5:37 AM, Sara Soto called the Port Aransas Police Department to report that her 12 year old son, Colby Christy (dob 08/06/2001), was sexually assaulted approximately 10 minutes ago by a 5'1 Hispanic male, later identified as Fred Martinez (Hispanic male, 5'5).   She said Fred would be in a vehicle with a SPURS flag next to an American flag or pirate flag. Soto was in the area of 230 N. On the Beach in Port Aransas, TX.  Officers Joseph Rivas (2223), Lance Sanders (2220), Jason Atwater (2221), Stephen Flores (2210) and Sgt. Jim West (2205) went to that location to investigate.

Officer Rivas's report stated that Soto said Fred was north of her location.  She said Fred was in a white SUV on the other side of a white camper trailer which was approximately 250 feet away from their campsite.

Soto told Officer Rivas she didn't witness the sexual contact.  Soto stated the incident occurred around her truck. Fred initially approached Colby asking for a lighter. While Soto was looking inside her vehicle for the lighter, the sexual contact occurred.  Soto told Fred she was unable to find a lighter, and Fred walked back towards his vehicle.  Colby then ran up to her crying and told her "he touched me, and he made me touch him." Soto asked Colby when it happened, and he told her "just now."

Officer Rivas spoke with Colby to get more detail about where Colby was actually touched, and he told Officer Rivas "a man asked me if I wanted to make a hundred dollars, he touched me in the private area, and he made me touch him in the private area." Colby said all of the sexual contact was done over the clothing.

Officer Rivas's report indicated that Colby got inside her truck and Soto asked him if he wanted to leave. He told her yes.  Soto went to the restroom where her 18 year old son, Steve Martinez, was and told him what happened.  She pointed out Fred.  Soto told Steve to go watch Colby while she went to the restroom.

Steve told Officer Rivas he saw Fred still standing near their vehicle about 60 feet away.  Steve stated Fred was acting very odd and made him feel uncomfortable. Steve walked over to him and made Fred leave. Steve started packing up their campsite and Soto called the police to report what occurred.

1. Officer Rivas told Officer Sanders and Sgt. West what he learned. Officer Flores and Officer Sanders identified two males, Joseph Willmon who was Fred's boyfriend, and Fred, who were in a vehicle that matched the description given by Steve and Soto.

2. Officer Sanders report stated he and Officer Flores walked over to the area Soto pointed out and they saw only one white vehicle near that location. He walked up to the vehicle and saw Fred in the front seat. He appeared to be sleeping. Officer Sanders told Fred why the officers were in the area. Fred became defensive and told Officer Sanders he had not left the area. Fred told him a family member had a police radio. Officer Sanders told him that the call had just been broadcast. He told Fred he was looking for a Hispanic male in a white SUV in the area, and he was the only person that fit this description. Officer Sanders wrote in his report that Fred had glassy eyes, slurred speech and the odor of a consumed alcoholic beverage emitting from his breath. Fred kept repeating to Officer Sanders that he did not leave the area. Fred kept asking who the victim of the sexual assault was. Officer Sanders noticed that Fred kept looking over towards where the victim was which was approximately 60 yards to the south of where he was. Fred told Officer Sanders that he had been asleep for the past two hours. Officer Sanders stated in his report that Fred appeared alert when he got out of his vehicle, and he did not yawn or stretch at all. Officer Flores noted in his report that Fred appeared wide awake when he and Officer Sanders made contact with him. Officer Flores also noted that Fred was confrontational with him and Officer Sanders at the beginning of their contact with him, and he continued to be verbally aggressive with them during the contact. Officer Sanders told Fred he was detained.

3. Officer Sanders spoke with Soto, and Steve who both stated that they could positively identify the male that was at their campsite asking for a lighter that touched Colby's genitals. Officer Sanders placed Sara into his vehicle and transported her to the location where Fred was. Sara told Officer Sanders that after seeing Fred she was pretty sure that Fred was the man who asked for a lighter and touched Colby's genitals. Officer Sanders repeated this process with Steve. Steve stated that he was 100 percent sure that Fred was the man who asked for a lighter and a touched Colby's genitals. Officer Rivas report stated that Colby was still traumatized from the incident and was afraid to get out of Soto's vehicle, so a field identification was not done with him.

4. Officer Rivas had probable cause to believe that Fred Martinez engaged in sexual contact with Colby and caused Colby to engage in sexual contact with him. He arrested Fred for Indecency with a Child. Officer Atwater transported Fred to the Port Aransas Police Department where he was booked in. At 6:50 AM on 06/06/2014, Officer Atwater collected Fred's shorts and shirt as evidence, sealed them in a bag, and placed them in an Evidence Locker at the Port Aransas Police Department. I, Sgt. Mike Hannon, later retrieved those items with gloved hands from the evidence locker at 9:30 AM on 07/07/2014 to photograph them. I sealed them and placed them in the Evidence Room at the Port Aransas Police Department at 09:35 AM on 07/07/2014.

5. I arrived at the Port Aransas Police Department at 8:00 AM on 07/06/2014. I spoke with the Officers involved about the incident. All of the Officers told me Colby had a demeanor that was consistent with being a victim of this crime and the account of what happened was credible.

6. Sara, Colby, Steve and Sara's youngest son, Alex Martinez (dob 10/03/2004, 9 y/o), were at the Port Aransas Police Department to give more detailed statements. Sara and Steve had given brief handwritten statements to Officer Rivas at the scene. Alex was not a witness to the incident and was not an outcry witness, so he did not give a formal statement.

I conducted video recorded statements with both Sara and Steve. Colby would later do a forensic interview at the Child Advocacy Center in San Antonio, Bexar County, TX, so I did not ask him any material questions or obtain a statement from him.

**Interview with Victim's Mother, Sara Soto**

I conducted a video recorded interview with Sara at 9:23 AM on 06/06/2014. I asked her about the men she had been married to and/or been in relationships with since Colby was born. I asked if any of them had sexually abused Colby or if Colby ever accused them of this, and she said no to both questions. I asked her how many times CPS had investigated her or Colby, and she told me never. I asked her what Colby's normal demeanor was, and she told me he was an outgoing, goofy kid.

Sara told me they arrived in Port Aransas on 06/05/2014 at 9:00 PM. They set up a tent near their truck at the Horace Caldwell Pier. At some time later in the evening, Colby and Alex were in their tent and Sara and Steve walked by Fred and his family's campsite which was just one campsite away from theirs. Fred and his family called them over, and they stayed with them at their campsite for about three hours. Alex and Colby went back and forth between their campsite and Fred's campsite. While Sara was at Fred's campsite, she heard his family members say Fred likes them young and Fred likes them when they have crayons and coloring books. She assumed that meant Fred is attracted to younger males since she met his boyfriend Joseph and he was a lot younger than Fred. After three hours, Sara and Steve left Fred's campsite. She saw that Fred's family had gone to bed.

Sara told me when she got back to her campsite, Colby went into the tent with Alex and Steve was in her truck. Fred came over alone and asked for a lighter. Colby came out of the tent. She searched her truck for a lighter for about 5 minutes, and she could not find one. Fred walked away, and Colby immediately began crying and told her that Fred touched him and Fred asked him to touch Fred. He said he didn't want to tell her because he didn't want to ruin the relationship between her and Fred and his family. She told Colby to go into the tent and zip it up. She told Steve what happened, told him to watch his brothers, and she quickly went to use the bathroom near the campsite. She saw Fred hiding behind a truck about 500 feet away. She came back from the bathroom, and asked Colby if he wanted to leave. He said yes. She called the Police, and she began packing up their campsite.

Sara told me that when the Police arrived, they asked Colby if he could do a field identification of Fred. Colby was still crying and told Sara he didn't want to get out of the truck and he wanted to go home. Sara told me Colby has never appeared this upset. She said she had previously told Colby if anyone had ever touched him he needed to tell somebody.

Sara described Fred as a gay, 40 year old Hispanic male, 5'1, medium build wearing a white t-shirt with a design and striped shorts.

**Interview with Victim's brother, Steve Martinez**

I conducted a video recorded interview with Steve at 10:13 AM on 06/06/2014. I asked him about the men Sara had been married to and/or been in relationships with since Colby was born, and his response was consistent with Sara's. I asked if Colby ever accused anyone of sexually abusing him, and he said this was the first time. I asked him how many times CPS had been to his house and he told me never. I asked him what Colby's normal personality was, and he told me he was a happy, smart kid that likes to

play video games. He said that when Fred touched Colby, it was the saddest he ever saw him. He also told me Colby does not lie.

Steve told me he, Sara, Alex and Colby got to Port Aransas at the pier at 9:00 PM on 06/05/2014. He and Sara were walking sometime after that, and Fred stopped them and began talking to them. They joined Fred and his family at their campsite until 5:00 AM then Steve and Sara went back to their campsite. Steve was in the tent but heard someone outside talking to Sara. He and Colby got out of the tent. He saw Fred was there alone. Fred asked Sara for a lighter. Steve thought this was an excuse for Fred to mess with Sara since he knew Fred had a lighter at his campsite and saw him smoking.

Steve said Sara asked him to walk her to the restroom, and she was walking slow. He thought she was walking slow because Fred was messing with her. Steve was by the restrooms, which he said was a far distance from their campsite. He told me he guessed his mom came and Fred was messing with his brother because they were at the tent and he was at the restrooms with his mom. He said that was when Fred touched his brother. I asked him why he believed that, and he said Colby was crying and Sara told him to got to the tent and take care of Colby while she went to the restroom. He told me he didn't see what happened. Sara and Steve began packing up their campsite while Sara called the Police. He knew that Fred had a white SUV because he had seen him taking stuff out of it when he was at Fred's campsite.

Steve showed me a short video he took with his iPhone that was his mom and Fred talking. I copied the video to preserve it, however there wasn't anything evidentiary contained in the video.

Steve described Fred as a 30-40 year old, Puerto Rican or Mexican male, with short and dark hair, 5'1, skinny, wearing a white t-shirt with colored swim trunks.

**Consent to Obtain Victim Buccal Swab, Clothing and Photograph**

Sara gave me verbal consent (video recorded) to collect Colby's blue shorts that he was wearing when Fred touched Colby's genitals. I collected the shorts with gloved hands and immediately sealed them in an evidence bag. Sara also gave me verbal consent (video recorded) to collect a buccal swab from Colby and take one photograph of him. I placed the sealed bag and the buccal swab in the Evidence Room in the Port Aransas Police Department at 11:10 AM.

When I was around Colby at the Port Aransas Police Department collecting his clothing and obtaining a buccal swab, I noted he was quiet and did not have the outgoing, goofy demeanor that Sara said he normally had.

**Interview with Offender, Fred Martinez**

On 07/06/2014 at 11:39 AM, I conducted a custodial interview with Fred Martinez. Fred and I introduced ourselves to one another, and I offered him two bottled waters and some donuts. He accepted one bottle of water and declined the donuts. I told him he could take the other bottle of water or any of the donuts any time he wanted.

Fred told me he was going against the advice of his attorney and he would speak with me about what happened. I read him the Miranda Warning, he told me he understood his rights, and he agreed to waive his rights and speak with me.

P9. __7__ of __20__.

1. Fred told me he believed he was <u>arrested for raping a girl on</u> the beach. I asked him where he got that idea, and <u>he said from his family.</u> He followed this up by saying his family told him he raped a young male. He then said he had no idea where this was coming from.

2. Fred said he showed up to his family's campsite in Port Aransas on Friday (07/04/2014) night. He told me that this evening (07/06/2014) two people who he assumed were a couple (Sara and Steve) showed up at their campsite. He told Sara to come on over to their campsite and bullshit with him.

3. Fred said Sara told Fred Steve was her son and 18 years old, and Fred said he was about to joke that Steve was a little bit young for her. While Sara was at the campsite, <u>he said he put her down for smoking his boyfriend's cigarettes and drinking his beer.</u>

4. Fred said an hour later, a handful of kids showed up and Sara told him they were her kids (9:02 mark on video). He told the kids to dig a hole behind him. Fred told me she and Steve were at his campsite for about 2 hours or so.

5. <u>Fred told me his mother told him he was being ugly with Sara and told him to go to sleep.</u> He went to his car and Joseph accused him of hitting on Steve, which he denied. He said he went to sleep before lights shinning in his car window woke him up. He then backed up and said <u>Sara knocked on his window wanting more alcohol, he got out of his car to hide a bottle of bourbon, and Sara went away.</u>

6. <u>Fred said he woke up to the cops shining a light in his vehicle.</u> He asked them what was going on, and he said the cops told him a girl was raped on the beach and he was a suspect. He then said a boy got raped. He finally said Sara told him (Steve) was 18 years old. He told me he didn't know why he was here over a woman who accused him of raping her 18 year old son (14:10 mark on video).

7. I told him no one accused him of raping a girl or a boy. His response was why am I here that's what my family said. He said he didn't remember what they said. He told me some accusation of somebody doing something to somebody on the beach (15:37 mark on the video).

8. I asked Fred what his definition of rape was, and he told me anything aggressive towards anyone sexually if they aren't accepting it. I told him the definition of rape was penetration of someone's anus or vagina or someone penetrating another person's mouth with their genitals.

9. Fred told me he was there to help the police (16:52 mark). This was inconsistent with Officer Flores and Officer Sanders reports which stated Fred was defensive, uncooperative and appeared deceptive (saying he had been asleep for hours even though both officers noted he appeared wide awake).

10. Fred told me that the female he met on the beach was named Sara, and he believed she was insinuating Steve was gay. I told Fred Sara had some other sons. He said the ones behind him digging a hole. He held his arm out low like a person would to show someone was short like a child. <u>I asked how old he thought they were,</u> and he said he didn't pay attention. He then said Sara told him <u>they were 9 and 11</u> years old (20:04 mark on the video). He said there were two of them and they looked almost identical. The two sons were at the campsite and Sara came looking for them.

During Fred's account of events to this point, he used his hands to talk, he was pleasant and smiling.

11. Fred confided in me that his Uncle molested him when he was 8, 9, or 10 years old (25:01 mark on the video). He still sees his Uncle, and his family knows he was molested. He told me he would never put a

kid through that (molestation). I asked him if his uncle was ever held responsible, and his reply was he told his Uncle face to face what happened and his uncle doesn't deny it but doesn't say its true. He said he blamed himself and he was gay because this happened to him as a child. <u>He said he would never do this to a child</u>. He said he always thought he did something wrong to deserve what happened to him. He said he has been through counseling and its something he can't help.

Fred said he didn't ask to be gay but he thought it was ok to experience with men and women and its because of what happened to him as a child. <u>He told me he wouldn't put anything on any child to be ridiculed and be put down for the rest of their life for what they've been through</u> (28: 45 mark on the video).

I asked Fred if he struggled with being a little boy and told to like girls, and he interrupted me and said he hadn't hit puberty and didn't know about sexuality at that time. He said growing up he thought it was normal to have sexual experiences with boys and girls. When he turned 21, he had his first boyfriend and came out (29:59 mark on video).

I told Fred I've spoken with other men who have been molested by a family member when they were a child and were later accused of touching a child. Fred said in a low voice no, no, I'm not, no while moving his head side to side. He said he doesn't struggle with his molestation and it was resolved. I told him I could tell from what he told me about his molestation he still struggled with it, and he repeated he didn't and still has drinks with his Uncle (31:58 mark on the video).

I told Fred there is a 12 year old boy and you came to the mom (Sara) and asked her for a lighter. Fred looked at me and asked 12 year old boy? I told him one of Sara's sons that he told me he saw earlier, and <u>I said you asked Sara for a lighter</u>. He looked directly at me, paused for a second, furrowed his brow and <u>responded in an unsure tone no I didn't</u>. I repeated that he asked her for a lighter, and his voice got loud and his tone became aggressive. I told Fred this was after his family went to sleep and 10 minutes before he got woken up he went over and asked Sara for a lighter. Fred loudly and repeatedly asked me over where. Fred then made the admission that he had four lighters in his car but he didn't want to go back in there because Joseph was asleep (37:23 mark on the video). I confronted him with the fact that that would be a good reason to go ask for a lighter. He replied that Joseph was already awake. <u>I told Fred he was leaving out an important part of the story by not talking about being by Sara's car asking for the lighter</u>. He became increasingly loud and angry when I brought up being by Sara's car asking for the lighter. Fred bladed his body away from me and turned away from me uncomfortably.

<u>Fred told me there was no way it could have happened. I asked him why there was no way. He told me it was because he wasn't there</u>. I confronted him with the fact that his voice got raised when I talked about him going to Sara's vehicle asking for a lighter. He said his voice got raised when he was accused of a 12 year old. It should be noted that before he made that statement, I never made any accusation that he did anything with a 12 year old. In fact, I reminded him I only told him Sara had a 12 year old before I started asking him about going to her vehicle to ask for a lighter. I said she had both a <u>9 year old and a 12 year old</u>. He said he didn't know their ages (47:20 mark on the video), yet at the 20:04 mark on the video he told me Sara told him her sons were <u>9 and 11</u> years old. Fred continued to yell at me and began to cuss at me. Throughout the interview, I kept a normal tone of voice and calm demeanor.

**1.** Fred told me that he never left his campsite after going to bed (52:40 mark on the video). He asked me what he was being charged with, and I told him Indecency with a Child (54:20 mark on the video). Fred told me he didn't see Sara's children, he only saw her 18 year old (55:08 mark on the video). I noted that he told me at the 20:04 mark on the video that Sara's boys looked identical. I showed him a picture of Colby without saying a word, and he told me I've never seen that kid before. I told him bullshit. He immediately said I never paid attention they were digging a hole back there. I told him you've never seen this kid but now he's digging a hole. He said he told them to dig a hole. I said to him you have seen this kid. He responded sue me maybe I have. I told him this boy (Colby) told his mother that Fred touched Colby's genitals over his clothes. Fred told me there was no way because Fred's family would have seen him. He said he wouldn't do that to a child, and repeated three times his family didn't see him do it.

**2.** I told Fred that what he did wasn't rape because that is something a monster would do. I told him what he did was something someone who was struggling with what their Uncle did to them when they were a child would do. Fred slapped his hand on his chair, said hell no, turned his back to me, and grabbed another bottle of water. He then pointed at the picture of Colby and said he would not recognize him in a crowd. I told Fred that right now he knew exactly how Colby felt because he went through it. He told me he didn't know how he felt because he didn't know what happened to him. He then slammed his bottle of water on the table and moved his chair into the corner. He said stop, stop, stop let's go. He stood up, said he was done, and he was calling his attorney. He told me fuck you fuck you and turned to face the unlocked door of the room. Since, he was so angry, still in custody, and was walking toward an unlocked door that opened into the Police Department, I stood up and told him to sit down and calm down for both our safety. He yelled at me to get him out of here, and I repeated for him to sit down and I would get him out of here. He then sat down and started yelling that the mother, Sara, put him (Colby) up to it. I told him I could take him back to his cell when he calmed down and uncrossed his arms. He kept yelling and sitting with his arms crossed, and I said if he didn't want to talk that was fine but he needed to take a breath and calm down before I could take him to his cell. He said ok and lowered his voice.

**3.** Fred asked me if I was going to listen to him, and we reengaged our conversation. He kept telling me Sara put Colby up to it, he was never at her vehicle and never with the child (Colby). He then told me maybe it did happen but it wasn't him (1:01:00 mark on the video). He said that maybe he (Colby) was going through the same thing he went through.

**4.** Fred told me Sara's motive for putting Colby up to it was revenge because he was dogging her all night. I asked him if she wanted to falsely imprison him because he dogged her about her not watching her kids since 9:00 PM yesterday. He told me yes, why would she care about me. I told him that's exactly why it wasn't a good motive since she didn't care enough about him to go to all that trouble.

**5.** I told Fred that he got to get his closure with his Uncle, and he told me he never got to get his closure. I noted this contradicted what he said at the 31:58 mark on the video when he told me he resolved his molestation and he still drinks with his Uncle. He told me if he was being charged then he was done. I tried to stop the interview again and he reengaged the conversation.

**6.** I asked Fred for written consent to get a buccal swab from him. He first asked to call his attorney, and I told him he could. He then said he didn't need to call his attorney, read and signed a written consent

pg. __10__ of __26__

form.  I obtain a buccal swab from him and placed it in the Port Aransas Police Department Evidence Room at 12:55 PM.

Fred asked me to contact his family to obtain witness statements, and I told him I'd be happy to.  I collected their names, and Fred told me there was no reason for his family to contact me to give a statement because it wouldn't get him released.  I explained to him that I needed those statements even if he was charged because that was evidence that could support what he was telling me.  I thought it was strange that Fred tried to dissuade me from getting witness statements from his family that, according to him, would prove he wasn't at the crime scene.

I ended the interview at 1:14 PM and returned Fred to his cell.

**Witness Statements from Offender's Family**

When I returned to my office I had a message that Fred's brother, John Martinez, had called me.  I called him back and got his voicemail.  I asked him to come to the Port Aransas Police Department with the people that were at Fred's campsite and provide statements.  An hour later, when I was leaving the office to go to Corpus Christi for a follow-up on another incident, John arrived at the Port Aransas Police Department with the people that were at Fred's campsite.  Det. Seth Rosebrook also arrived at the Port Aransas Police Department at this time to start his shift.  He took statements from John and the people that had been at Fred's campsite.  Their account of events were very consistent with Sara's and Steven's account of events.  Det. Rosebrook's report indicated that John and Joseph both stated Fred left their campsite and walked to the bathrooms near Sara's campsite during the timeframe of the crime.  They said he was gone between 5 and 10 minutes, which was consistent with Sara's timeframe of how long Fred was at her campsite asking for the lighter.  John Martinez drew Det. Rosebrook a map which showed he knew where Sara's campsite was.  These statements provided further evidence that Fred was being deceptive and put him at the scene when the crime occurred.

**Second Interview with Offender by Det. Seth Rosebrook**

Det. Rosebrook asked Fred if he wanted to speak with him with his rights still in mind, and Fred said he wanted to speak with him.  Det. Rosebrook confronted him with the fact that members of his party told Det. Rosebrook that Fred left the campsite at the time of the offense.  Fred admitted he did leave the campsite.

*Otc fails to inclue detail of Fred leaving for the RR. Not Soros Camp.*

**Review of Jail Phone Calls**

On 07/07/2014, Det. Rosebrook reviewed 8 phone calls that Fred made from his holding cell at the Port Aransas Police Department.  Det. Rosebrook's report states that Fred told his family that he never left the camp and went to Sara's campsite.

**Criminal and CPS Histories**

pg. 11 of 26.

I ran Fred's criminal history, and he had several financial crime offenses.  He did not have any sexual offenses.  I ran Sara's criminal history, and she had no criminal history.  Officer Rosebrook contacted CPS, and they had no reports open involving Sara, Colby or Fred.

**Victim Interview at Child Advocacy Center**

On 07/10/14, Sara brought Colby to CHILDSAFE, the child advocacy center located at 7130 W Hwy 90 in San Antonio, TX.  Forensic interviewer Lucy Gallaegos interviewed Colby.  He told her that Fred touched him on his "privates" "where he pees" with Fred's hand over his clothes.  He also told her that Fred made Colby touch Fred on Fred's "privates" over his clothes with Colby's hand.  She asked him if Fred said anything to him, and he told her it was personal.  She asked if he told anyone what Fred said, and Colby said he told a policeman.  Colby cried during the interview when asked about Fred touching him, him touching Fred and when asked what Fred said to him.  Gallegos left the room after this, and Colby curled up against the chair in the room and continued to cry.  His demeanor and actions were extremely credible and consistent with a child victim of sexual abuse.

**Conclusion**

The following facts and circumstances were evidence that Fred Martinez committed the offense of Indecency with a Child:

The victim made an immediate and credible outcry

Several witnesses, including the offenders own witnesses, put him at the scene of the crime during the timeframe of the crime within the length of time it took to accomplish the crime (opportunity and means to commit the crime)

The offender was attracted to the profile of the victim, a young male (motive to commit the crime)

The offender was deceptive about material facts of the case (seeing the victim, being at the scene of the crime during the time the crime was committed)

Note: On 07/14/2014, Det. Jeff Chain submitted the suspect's and victim's clothing and the suspect's and victim's buccal swabs to the DPS Lab in Corpus Christi, TX for analysis.  As of the writing of this report, results are pending.

End of report.

M. Hannon, 2206

pg. 12 of 26.

1. On July 7th, 2014 and at 5:37 AM, I, Port Aransas Police Officer Joseph Rivas #2223, was dispatched the area of 230 N. On the beach Rd, in Port Aransas, Texas in reference to a sexual assault. Port Aransas Police Officers Jason Atwater #2221, Stephen Flores #2210, Lance Sanders #2220, and Sgt. James West responded as well.

2. Once I located the victim, and his parent, the mother Sara Soto told me the suspect, later identified as Fred Martinez, was still in the area. I asked Soto to point out in the direction he is in, Soto pointed north of their location, and stated Martinez was on the other side of a white camper trailer, in a white SUV, which was approximately 250 feet away from their campsite.

3. I asked Soto how she knew who the suspect was, since she didn't witness the sexual contact. Soto stated the incident occurred around their truck. Fred initially approached the victim asking for a lighter. While Soto was looking inside their vehicle for the lighter, the sexual contact occurred. Soto told Fred she was unable to find a lighter, Fred walked back towards his vehicle. Soto's son, then ran up to her crying and told her "he touched me, and he made me touch him." Soto asked her son when it happened, her son told her "just now."

4. I spoke with the victim, and he told me "a man asked me if I wanted to make a hundred dollars, he touched me in the private area, and he made me touch him in the private area." The victim told me all the sexual contact was done over the clothing.

5. The victim got inside the truck and Soto asked her son if he wanted to leave, he stated yes. Soto went to the restroom, where her older son, Steve Martinez, was at and told him what happened, and pointed out Fred. Soto told Steve to go watch his brother (victim), while she went to the restroom.

6. I spoke with Steve, he stated he saw Fred still standing near their vehicle, approximately 60 feet. Steve stated Fred was acting very odd, and made him feel uncomfortable. Steve walked over to him, and made him leave. Steve stated he started packing up their campsite and Soto called the police to report what occurred.

7. I advised Officer Sanders and Sgt. West what occurred. Officer Flores and Sanders identified two males; which were Joseph Willmon, and Fred Martinez, who were in the vehicle that matched the description given by Steve and Soto. Officer Sanders conducted a field identification with Steve and Soto separately. Both Soto and Steve identified Fred Martinez as the suspect. The victim was still traumatized from the incident, and was afraid to get out of the vehicle, so a field identification was not done with him.

8. Fred Martinez engaged in sexual contact with a child, by touching him on the genitals through the clothing, which is Indecency with a Child, Texas Penal Code 21.11(a)(1), which is a Second Degree Felony. Therefore Fred Martinez Jr. was placed under arrest, and was placed into Officer Atwater's marked patrol vehicle, where he was transported to the Port Aransas Police Department to be booked in.

Pg 13 of 26.

On 07/06/2014 I Detective Seth Rosebrook was asked by Sgt. Mike Hannon to conduct witness interviews of a family that was in the area of an alleged indecency of a child. I was advised by dispatch that John Martinez was in the lobby to make a statement.

I brought Martinez into the interview room to make a statement and advised him that I was going to be recording the statement. Martinez told me that he and his family were camping just south of Horace Caldwell pier in Port Aransas TX. Martinez told me that his brother Fred Martinez was drinking at the camp fire around 1am on 07/06/2014 when a female and male walked by. John Martinez said that Fred yelled at the two to come and join the group. John Martinez said that the female named Sarah and her 18 year old son named Steve joined them and drank with them. John Martinez said that about 2 or 230 two younger children ages 9 and 12 joined them and were introduced as Sarah's children. John Martinez said the children played around while they sat around the fire. John Martinez said that Sarah left around 430am. John Martinez said that around 5am everyone went in for the night after packing it in for the night and Sarah was just kind of hanging around. John Martinez said that Fred Martinez told her to go away and she did. John Martinez said that he went to his bed in his trailer and played the game candy crush on his cell phone. John Martinez said that the truck Fred Martinez and his boyfriend Joseph Willmon were in was right outside his window and that he could see them. John Martinez said that he saw Sarah'a 18 year old son go to Fred Martinez's truck a couple times after Sarah had left. John Martinez said he could not hear them because of the generator. John Martinez said that he saw Fred Martinez leave and walk south on the beach with toilet paper. John Martinez said that Fred Martinez came back 5-10 minutes later and got back in his truck just before 6am. John Martinez said he then fell asleep and woke up to Willmon telling him that the cops were taking Fred Martinez to jail. John Martinez made me a map of the scene that night and explained that they were just south of Caldwell pier. John Martinez made a diagram showing where each person was parked and where Sarah and her sons were parked. John Martinez specifically said Sarah was camped down by the bathrooms to the south. John Martinez specifically states that Sarah told them she was camped south of the Martinez's camp site. John Martinez said he did not know how far away she was camped because he did not go down there. I attached John Martinez's diagram to the case file. John Martinez said he did not know where Fred Martinez went until later in the morning when Joseph told him that he went to take a dump and that he did not bring back any toilet paper so he obviously took a dump. John Martinez said that he had heard rumors that Fred Martinez was molested when he was younger by his uncle. I concluded the interview with John Martinez after explaining to him that Fred Martinez would be transferred to Corpus Christi and have to be bonded out of the county jail.

The next witness I interviewed was Willmon. I introduced myself and advised him that I would be recording the interview. Willmon said he understood and told me that he fell asleep early because he drank too much. He said his boyfriend Fred and he had been together for about 8 months and that Fred was 40 and he was 21. Willmon said that he met a female and a male that Fred Martinez introduced him to when he woke up but he did not remember their names. Willmon said he trusted Fred Martinez and said the only time he left was alittle before the police got there. Willmon said that Fred Martinez went to the bathrooms to the south of their camp. Willmon said Fred Martinez was gone about 5 minutes or a little longer. Willmon did not have much else to say except for that he knew Fred Martinez did not commit this crime. I asked Willmon if the diagram that John Martinez appeared accurate and he said yes.

1. I then interviewed the next witness identified as <u>Elvia Guerra who is Fred Martinez's mother</u>. Guerra said the same thing as everyone else about Sara and Steve coming to the camp fire at about 1am. Guerra also said that a 9 and 12 year old boy came to join them about an hour later. Guerra said that <u>she saw around 5am Sarah not wanting to leave and Fred Martinez being ugly towards her</u>. Guerra said the <u>18 year old Steve stayed around with Fred Martinez</u>. Guerra said she went to bed after that and was awoken when the police took Fred Martinez. Guerra told me that when Fred Martinez was young he was molested by his uncle. I asked Guerra if the diagram that John Martinez drew represented an accurate depiction of the scene and she said that it did.

2. I then interviewed Isabel Martinez who told me that she went to bed a little earlier then everyone else but she did meet Sarah and Steve. <u>Isabel Martinez said that Fred Martinez was being ugly towards Sarah</u> and that she went to bed a short time later. Isabel Martinez also said that it was Fred Martinez that initiated contact with Sarah and Steve by asking them to come and have a beer with them.

3. I spoke to Sgt. Hannon who told me that Fred Martinez waived the Miranda warning and made a statement. Sgt. Hannon told me that Fred Martinez told him that he never left the area they were camping at and was very persistent that was a fact.  I asked Sgt. Hannon if Fred Martinez ever invoked his 5th amendment rights and Sgt. Hannon said no. Sgt. Hannon said that Fred Martinez <u>got upset and asked to be taken back to his cell</u>.

4. Just before Fred Martinez was being transported I went into the booking room and introduced myself. I told him I had a question but that he did not have to answer if he did not want to. <u>I asked Fred Martinez if he remembered going to the bathroom that evening</u> and he said huh? I again asked and <u>before I finished he said yes</u>. Fred Martinez said <u>he did not know the bathrooms were next to the victim's camp</u>. Fred Martinez said he remembered going to the bathroom because he didn't wipe. Fred Martinez said he did not know where Sarah's camp was. I asked him how did his mother and <u>brother know where she was camped</u> and Fred Martinez said that no one knew where she was camped. I asked Fred Martinez if he knew the name of the 18 year old boy and he said no I called him sarita. Fred <u>Martinez said that Sarah put her son up to making the allegations</u> because she wanted more to drink and he was making fun of her 18 year old son. I tell Fred Martinez that it's a really big coincidence that he went to the area of Sarahs camp around the same time the assault took place. Fred Martinez said I know it is. I asked him what time he went to the bathroom and he gave me a long story but did not give me a time. I told him it looks really bad and he said it does. Fred Martinez proceeds to tell me he is a law student and he wouldn't do that. I asked Fred Martinez why John Martinez would tell me that he left with toilet paper and he said I don't know. Fred Martinez then said my question is <u>if this happened where was the mom</u>. I then told Fred Martinez exactly what was alleged and he said no and I asked him <u>why would they make those allegations and he said because we argument</u>. <u>Fred Martinez was persistent that Sarah made up the story and told her kids to go with it</u>. Fred Martinez said that he does not know why a 12 year old would make this up and that he would not put a kid through this and I said because it happened to you right and Fred Martinez said yes it happened to me when I was 7-8 years old. Fred Martinez then said but it was more than just a touch with me.  Fred Martinez said that his family would not know where Sarah was staying and he said his family found out after investigating who was making the allegations. I asked Fred Martinez why he assumed that Sarah and her family were camped north of the pier and he said that is where they came from I asked him I thought they came from the showers and he said they did. I again asked why he thought they were camped over there and he said because

they told me they just got there. I asked what time did they get there and he said about 9:30 or 10pm. Fred Martinez  said that Sarah showed up around 10 or 11pm but he then says I don't know I didn't have my cell phone on me. I tell Fred Martinez that it would be impossible for his family to find Sarah's camp and he said why and I told him that they were gone when he got arrest he said ok I don't know then I asked Fred Martinez if he remembered the 18 year old coming back to his truck after Sarah left and he said no. I tell Fred Martinez that the Dunes Condo adjacent to where they are camped has two cameras on the top and that I had watched the video and asked him again if he remembered the 18 year old coming to his truck and he said I thought that was the mom. I asked Fred Martinez if Sarah looks like the 18 year old and he giggled and said no I can tell the difference between a girl and a boy. I tell Fred Martinez that John Martinez and his boyfriend both say that the 18 year old came back to the truck and I said what is that all about you said he didn't and he said I was trying to get in his pants. I said and both times that he came to your truck did he come from the showers or did he come from the bathrooms and he said I don't know. I asked him how he could not know and he said I don't know. Fred Martinez said he was not lying but he was just leaving parts out. Fred Martinez said the first time he went to the bathroom the 18 year old followed him back to his camp. Fred Martinez then says he did know that the 18 year old was coming from by the bathrooms. It is apparent at that point that Fred Martinez is forgetting what he had already told me and I have to remind him that he has already admitted to going to their camp and he said yes I went down there but I didn't molest any kids. Fred Martinez then say I didn't know he was camping down there until I saw him leave....maybe. Fred Martinez made it clear that he was talking to the police against his attorney's wishes. Fred Martinez said I could have waived having an interview and I didn't. I told Fred Martinez that seeing as how he waived his rights and wanted to talk to me that it was not in his best interest to lie and that if he was going to continue to lie he should probably take his attorney's advice. Fred Martinez tells me that he did not think it was going to go this far. Fred Martinez asked to draw a diagram and I let him. Fred Martinez kept arguing facts that he had already admitted were fact but now he was saying did not happen. <u>It was apparent that Fred Martinez would never admit to what he did and he just wanted to argue</u>. I told Fred Martinez what I thought happened and he started laughing. I was completely disgusted and I asked Fred Martinez how he could laugh about such an allegation and he said cause its funny. I came around the desk asking how he could find touching a 12 year old funny and Fred Martinez backed towards the door and raised his hands screaming at me "fuck you". I believed Fred Martinez was going to run out the door or fight (fight or flight) so I attempted to grab his raised arm. Fred Martinez pulled his arm away from me and I wrapped him up and placed him against the counter until Officer Ponder arrived to assist me. I cuffed Fred Martinez and sat him back on the bench. I ended my interview of Fred Martinez while he was laughing. Fred Martinez was still smiling as I left the room.

On 07/07/2014 I reviewed 8 phone calls that Fred Martinez made from the jail cell in which he has no expectation of privacy. Fred Martinez mostly talked to his sister but would occasionally talk to Willmon. <u>Fred Martinez never admits to committing the crime</u> and even lies to his family about ever leaving the camp. I found it odd that his sister told Fred Martinez in one of the calls that is not how it happened Fred. Fred Martinez tells his family that he is going to talk to Police against his attorney's advice. Other comments made in the phone call that seemed odd to me are as follows: <u>Fred Martinez tells his sister that the victim is Sarah because it could be no one else</u>, in the 4th call Fred Martinez tells his family multiple times that he never left the camp after he went to bed, Willmon tells Fred Martinez that he should never gone with that boy, Fred Martinez tells Willmon that he never left, Fred Martinez tells family "I thought it was Joseph" (Call 5), sister repeats that she was not around to witness Fred

they told me they just got there. I asked what time did they get there and he said about 9:30 or 10pm. Fred Martinez said that Sarah showed up around 10 or 11pm but he then says I don't know I didn't have my cell phone on me. I tell Fred Martinez that it would be impossible for his family to find Sarah's camp and he said why and I told him that they were gone when he got arrest he said ok I don't know then I asked Fred Martinez if he remembered the 18 year old coming back to his truck after Sarah left and he said no. I tell Fred Martinez that the Dunes Condo adjacent to where they are camped has two cameras on the top and that I had watched the video and asked him again if he remembered the 18 year old coming to his truck and he said I thought that was the mom. I asked Fred Martinez if Sarah looks like the 18 year old and he giggled and said no I can tell the difference between a girl and a boy. I tell Fred Martinez that John Martinez and his boyfriend both say that the 18 year old came back to the truck and I said what is that all about you said he didn't and he said I was trying to get in his pants. I said and both times that he came to your truck did he come from the showers or did he come from the bathrooms and he said I don't know. I asked him how he could not know and he said I don't know. Fred Martinez said he was not lying but he was just leaving parts out. Fred Martinez said the first time he went to the bathroom the 18 year old followed him back to his camp. Fred Martinez then says he did know that the 18 year old was coming from by the bathrooms. It is apparent at that point that Fred Martinez is forgetting what he had already told me and I have to remind him that he has already admitted to going to their camp and he said yes I went down there but I didn't molest any kids. Fred Martinez then say I didn't know he was camping down there until I saw him leave....maybe. Fred Martinez made it clear that he was talking to the police against his attorney's wishes. Fred Martinez said I could have waived having an interview and I didn't. I told Fred Martinez that seeing as how he waived his rights and wanted to talk to me that it was not in his best interest to lie and that if he was going to continue to lie he should probably take his attorney's advice. Fred Martinez tells me that he did not think it was going to go this far. Fred Martinez asked to draw a diagram and I let him. Fred Martinez kept arguing facts that he had already admitted were fact but now he was saying did not happen. It was apparent that <u>Fred Martinez would never admit to what he did and he just wanted to argue</u>. I told Fred Martinez what I thought happened and he started laughing. I was completely disgusted and I asked Fred Martinez how he could laugh about such an allegation and he said cause its funny. I came around the desk asking how he could find touching a 12 year old funny and Fred Martinez backed towards the door and raised his hands screaming at me "fuck you". I believed Fred Martinez was going to run out the door or fight (fight or flight) so I attempted to grab his raised arm. Fred Martinez pulled his arm away from me and I wrapped him up and placed him against the counter until Officer Ponder arrived to assist me. I cuffed Fred Martinez and sat him back on the bench. I ended my interview of Fred Martinez while he was laughing. Fred Martinez was still smiling as I left the room.

On 07/07/2014 I reviewed 8 phone calls that Fred Martinez made from the jail cell in which he has no expectation of privacy. Fred Martinez mostly talked to his sister but would occasionally talk to Willmon. <u>Fred Martinez never admits to committing the crime</u> and even lies to his family about ever leaving the camp. I found it odd that his sister told Fred Martinez in one of the calls that is not how it happened Fred. Fred Martinez tells his family that he is going to talk to Police against his attorney's advice. Other comments made in the phone call that seemed odd to me are as follows: <u>Fred Martinez tells his sister that the victim is Sarah because it could be no one else</u>, in the 4th call Fred Martinez tells his family multiple times that he never left the camp after he went to bed, Willmon tells Fred Martinez that he should never gone with that boy, Fred Martinez tells Willmon that he never left, Fred Martinez tells family "I thought it was Joseph" (Call 5), sister repeats that she was not around to witness Fred

Martinez's actions that night, sister tells Fred Martinez that they are trying to get touch DNA and that is very hard to get and Fred Martinez says there is no such thing, (call 7) <u>Fred Martinez tells Willmon babe I did not do this and Willmon says I hope not.</u> Full versions of the calls were added to the case file.

On 07/11/2014 I telephoned Child Protective Services to file a report and get a history on the subjects involved. I spoke with Jenai #1078 and filed a CPS report #650081. Jenai told me because Fred Martinez was a stranger that an investigation would not take place. After verifying my employment Jenai called back and advised me that no one involved had a history with CPS.

End of Report

Seth Rosebrook

1.

On July 5, 2014 at approximately 5:37 AM, I, Officer Lance Sanders #2220, responded to 230 N OTB to assist other officers with a sexual assault. Upon arrival I made contact with Officer Joey Rivas #2223, who informed me that a 12 year old male had been touched by a Hispanic male driving a white vehicle. Officer Rivas advised that the hood of the vehicle was supposed to be up. Officer Rivas advised me that the vehicle was near Lantana Drive. I along with Officer Stephen Flores, #2210, walked over to the location and observed a white SUV parked in the area. I observed that it was the only white vehicle near the location. I walked up and observed a male subject in the front seat that appeared to be sleeping.

2.

I walked towards the back of the vehicle and asked Officer Rivas over the radio if it was an SUV that I was supposed to be looking for. Officer Rivas advised it could possibly be an SUV. At that time I observed the male subject get out of the vehicle. Officer Flores contacted the subject and he was identified as Fred Martinez. I informed Martinez why we were in the area. Martinez became defensive right away. Martinez told me that he had not left the area. Martinez told me that a family member had a police radio. I informed him that the call had just been broadcast. I told Martinez that I was looking for a Hispanic male in a white SUV in the area. Martinez was the only person that fit this description. When I told him this Martinez began to look around before talking. Officer Jason Atwater, #2221, advised over the radio that the vehicle was the one described by the victim.

3.

I also observed that Martinez had glassy eyes, slurred speech and the odor of a consumed alcoholic beverage emitting from his breath. I had to tell Martinez again that the incident took place in the area because he kept telling me that he did not leave. Martinez kept asking who the victim of the sexual assault was. I observed that he kept looking over towards where the victim was (approximately 60 yards to the south of us). Martinez told me that he had been asleep for the past two hours. I observed that Martinez was alert when he got out of his vehicle, I also observed that he did not yawn or stretch at all.

4.

Martinez told me that he could not have left due to the fact that his car had overheated earlier. I asked Martinez if the hood of his vehicle had been up earlier. Martinez stated yes (which was the description Officers had been given first). Martinez kept asking who the victim was again. I had to advise him that I could not tell him who the victim was. Martinez then asked if he was free to leave and I told him no. At that point he was detained for the alleged offense at hand.

I went to speak with Officer Rivas about identifying the subject. Officer Rivas then advised me that the suspect had touched the victim over the clothes on the genitals and vice versa. I spoke with the mother of the victim, Sara Soto, and the victim's brother, Steve Martinez. Sara and Steve both stated that they could positively identify the subject if the saw him. I placed Sara into my unit and transported her to the location where Fred Martinez was. Sara told me after seeing him that she was pretty sure that Fred was the man who touched her son. I then went back and took Steve to the location. Steve stated that he was 100 percent sure that Fred Martinez had touched his brother.

1.

Fred Martinez engaged in sexual contact with the child and caused the child to engage in sexual contact. Martinez was placed under arrest for Indecency with a Child. Officer Atwater transported Martinez to the Port Aransas Police Department and booked into the holding facility without further incident.

End of Report
Officer Lance Sanders #2220

**1.**

On 07/06/2014 at 5:37 AM, I, Officer Jason Atwater was on patrol in Port Aransas. While on Patrol a call came out over dispatch radio about a sexual assault that had recently occurred just south of the Horace Caldwell Pier.

**2.**

I, Officer Atwater #2221 responded to the call with Officer J. Rivas #2223 arriving first. Myself and Officer Sanders #2220 and Officer Flores #2210 arrived shortly thereafter. Officer Rivas made contact with the complainant and gave officers a description of the suspect and where he was parked. The description was of a Hispanic male approximately 5'05" with a dog in a white SUV parked next to a RV just a few vehicles north of the location were Officer Rivas was currently speaking with the witnesses.

**3.**

Officers made contact with a male subject that was later identified as Fred Martinez. Martinez was in a white SUV with a small dog in the front seat. Martinez was approximately 5'05" and Hispanic. Martinez was parked next to the RV that was mentioned from the reporting party. Martinez matched the description that was given to officers.

**4.**

A field identification was performed and two people identified the suspect as the person in question. Officer Flores placed handcuffs on the suspect and escorted him to my patrol vehicle. I patted down the suspect and helped him into the back of my patrol unit. I proceeded to the Port Aransas PD with Martinez. Upon arrival at the PD Martinez clothes were collected and a Port Aransas jump suit was given to him. The clothes that Martinez had on at the time of the arrest were placed in an evidence bag and sealed by myself. The evidence bag was marked with a bar code and placed into evidence locker #2. Martinez was booked in for Indecency with a Child and I escorted him to a holding cell without incident.

End of Report
Officer Jason Atwater #2221

1.

On 07/06/2014 at 5:37 AM, I Officer Stephen Flores #2210 and other units responded to 230 North On The Beach in Port Aransas, Texas for a report of a sexual assault. I went down Highway 361 to Access Road 1A to look for the suspect vehicle.

2.

I overheard on the police radio Officer Joseph Rivas #2223 check out with the reporting party. Officer Rivas advised all units the suspect and the suspect vehicle was just north of his location. I responded to the area. Officer Rivas advised all units the suspect vehicle was white SUV with a Hispanic male inside of it. Officer Lance Sanders #2220, Officer Jason Atwater #2221 and myself made location to the suspect vehicle. Officer Rivas confirmed to all units the suspect vehicle was a white SUV.

3.

Officer Sanders and I observed a Hispanic male in the driver seat and a white male in the backseat. Officer Sanders made contact with the Hispanic male later identified as Fred Martinez Jr. Martinez looked to be wide awake when contact was made. Martinez was confrontational with Officer Sanders and I at the beginning of contact. Officer Sanders advised Martinez we were conducting an investigation and that he was a person of interest. I made contact with the other male in the vehicle later identified as Joseph Willmon. I asked Willmon to step out of the vehicle and come go to the back of the vehicle. I ran Willmon thru dispatch for warrants and Willmon came back clear.

4.

I stood by with Willmon and Martinez while other officers were conducting the investigation. Martinez continued to be verbally aggressive towards me and kept on asking if he could leave. I repeatedly told Martinez that he was detained for investigative purposes and was not able to leave. I was told that we were going to do a field identification on the suspect. I stood by and observed two patrol vehicles park in front of us. One of the vehicle then left my location and came back. I was advised by Officer Sanders that he had two positive IDs. I was told to place Martinez into custody. I placed handcuffs on Martinez and escorted him to Officer Atwater's marked police vehicle and secured him in the backseat. Officer Atwater transported Martinez to the Port Aransas Police Department. I followed Officer Atwater to the police department. Officer Atwater and I collected Martinez' clothing and gave him a jump suit. I booked Martinez in on Indecency with a Child and placed him in a holding cell.


EOR

Officer Stephen Flores #2210

pg. 21 of 26

# PORT ARANSAS POLICE DEPARTMENT
## STATEMENT

THE STATE OF TEXAS          §

CITY OF PORT ARANSAS     §

COUNTY OF NUECES          §


BEFORE ME, the undersigned authority, in and for the State of Texas, on this day personally appeared,
Sara Soto , who, after being by me duly sworn, deposes and states as follows:
My name is Sara Soto I am 36 years old and my date of birth is
09/17/77 . I live at 16909 Basilwood Dr. San Antonio , TX , 78213 .
My telephone number is 210-438-7135 I work at ST Luke Hospital

On 7/6/14 at approximately 537 Am Suspect walked up
to our vehicle and asked for a lighter, I looked
for lighter but didn't find one. He left then my
Son (victum) told me that Suspect made him
touch after he touched him in his private area.
And that he did it multiple times during the
time I was look for a lighter in my vehicle.
I am as the legal guardian of Colby D christy
am pressing charges for Sexual assault.

This statement is true and correct and I am giving it to    Joseph Rivas    <END>

I have read this statement consisting of ___ page(s), each of which bears my signature, and I do affirm that
all the facts and statements contained herein are true and correct.

Affiant

Subscribed and sworn to before me, JosEPH Rivas a peace officer of the State of
Texas and pursuant to 602.002 Texas Government Code, on this the 6 day of July 2014
A.D. 2013

Officer Signature

pg. 22 of 26.

**PORT ARANSAS POLICE DEPARTMENT**
**STATEMENT**

THE STATE OF TEXAS         §

CITY OF PORT ARANSAS    §

COUNTY OF NUECES         §

BEFORE ME, the undersigned authority, in and for the State of Texas, on this day personally appeared, Steve Martinez , who, after being by me duly sworn, deposes and states as follows:
My name is Steve Martinez . I am 18 years old and my date of birth is 03/31/1996 . I live at 1611 Copper Field 78251-3325 SA, TX
My telephone number is 210-557-0523 I work at not working

On 7/6/14 at Appoximilly 537 Am. I was next to the portal bal restrooms & I saw the guy, he was around My Mom's truck. And then I took well walked the guy back to his camp area. And then come back to My mom's truck. My Mom pointed me out the guy. He made me feel uneasy him being around. He said he has a dirty Mind.     SM

SM                          SM

SM

This statement is true and correct and I am giving it to   Joseph Rivas           <END>

I have read this statement consisting of      1    page(s), each of which bears my signature, and I do affirm that all the facts and statements contained herein are true and correct.

Steven Martinez
**Affiant**

Subscribed and sworn to before me, Josel Rivas a peace officer of the State of
Texas and pursuant to 602.002 Texas Government Code, on this the  6th  day of  July 2014 .
A.D. 2013

**Officer Signature**

Page   of

MH pg. __23__ of __26__.

Christy 8-6-2001

Sara Soto    son         Colby   (c) 210-438-7135
9-17-77
6909 Basil Wood, San Antonio TX 78213
— ~~Daniel~~ Robert Christy    hasnt seen in 8 years
bio dad, doesnt know dob

— Steve Martinez   8/30/1975
divorced, June 2010
— Christopher ~~Lee~~ Pyles   lives in Maryland
ex bf.
3 years 2010-2013        (arrived on beach @ 9:00 PM)

never out any of sex assault
goofy kid; talks to everybody

name: said, but cant remember
6th of July
5:30 AM           age: 40 (said age)
                 tall: shorter 5'1
— description of them.   build: medium  skinny.
                 hair: black
                 race: hispanic
— The guy walking ~~that asked for lighter~~  clothing: T-shirt white w/design
                                            shorts big stripes
5 min. looking for lighter - how long?   face: clean shaven
       guy walk up alone for lighter?   really gay: fruity voice

·11 ·i my outside

1

MH  pg. 24 of 26.

family said ~~he~~ he likes them young
likes when they have Crayons and
Coloring books.

boyfriend name: Joseph younger

CAC

PO?

give suspect

2

MH

pg 25 of 26.

Steve Martinez IV
3/31/1996

Soto
- Sara Martinez (m)

- Steve Martinez
    divorced   3-4 years

- Chn3                    up north

no CPS

1ST

6th 530 AM

                                    he was at
                                    ~~test~~ port-a-potty
                                        when it happened

                                    name: can't remember
Guy descrip ? ———→    Age: 30-40
taking nasty              race: Puerto rican/mexican
                          hair: short/dark
                          tall: 5'1
                          build: skinny
                          clothing: ~~Tshirt~~ white
                                        shorts
                          Clean shaven ——— See night
                          Goofy - stories
                          from San Antonio

3

pg. __26__ of __26__.

alone when asked for lighter

white SUV  (10 ft away)

Item

(5) = 6 pages

Attachment #3

Trial Counsel's
Sworn Affidavit

Tr. ct. No. 14-CR-2389-B

## AFFIDAVIT

THE STATE OF TEXAS

COUNTY OF NUECES

BEFORE ME, the undersigned authority, on this day personally appeared Clay Bonilla, who after being by me duly sworn upon oath says as follows: My name is Clay Bonilla, and I am an attorney duly licensed to practice law in the State of Texas. I represented Mr. Fred Martinez during the proceedings in which the State of Texas indicted him for two counts of indecency with a child in Cause number 14-CR-2389-B. I am aware that Mr. Martinez has filed an application for a writ of habeas corpus, in which he accused me, as he has done in other capacities, of numerous allegations, including ineffective assistance of counsel. I deny all of these allegations and offer this affidavit in response to these allegations.

(1.) First, Mr. Martinez complains I was ineffective because I labored under a conflict of interest and set my personal interests ahead of those of Mr. Martinez.

My response to this allegation is that is categorically untrue. My Father pled guilty in Cause number 09-CR-3440-G on May 2. 2011. As a result of his plea, he was placed on probation. Eventually, in August of 2014, his probation was revoked and he was sent to the Texas Department of Criminal Justice to begin serving a period of confinement. In December 2014, A Motion for Shock Probation was filed on his behalf by his counsel, Angelica Hernandez. After my representation of Mr. Martinez had concluded, a hearing on my Father's case was held in February, 2015 in the 319th District Court.

\* Petitioner's trial held in Jan. 2015, (Exhibit #13)
\* Counsel hired Dec. 1st 2014, (Exhibit #12).

STATE'S EXHIBIT 2

D 1

(1). *Coil*

   I was called as a witness to testify on his behalf. I did not represent my Father in the handling of the motion, as I was a witness. My law firm did not represent him in the matter and therefore, did not negotiate his case or have any independent communication with the District Attorney's Office concerning his requests. Any communication was handled by Angelica Hernandez. However, from what I can recall, there were no negotiations concerning his Motion for Shock Probation. *Counsel testified in father's defense, proving bias.*

(2).   Second, Mr. Martinez complains that I negotiated his criminal case as also did my law firm negotiate his father's criminal case with the same prosecution, in the same courthouse and "at the same time frame."

   My response to this allegation is that again, Mr. Martinez is mistaken. My law firm did not take part in any negotiations on my Father's behalf during the term of my representation of Mr. Martinez. Mr. Martinez is correct that his case and the case of my Father were heard in the Nueces County Courthouse. Clearly, Mr. Martinez is confusing the issue, as he must be aware that every District Court case in Nueces County is heard in the same court house. \* *Counsel lies by omission, as He fails to address "both cases overlapped," under oath.*

(3)   Third, Mr. Martinez complains I was ineffective because I exhibited unethical behavior when I allowed the prosecution the referral of Mr. Martinez to procure legal representation, which caused a conflict and furthermore is illegal.

   My response to this allegation is that Mr. Martinez is confused. He was not referred to me by anyone. Mr. Martinez approached me and asked for a business card after observing me argue a case for another client in the 117th District Court. After he approached me, I initially met with him outside the 117th District Court. He asked numerous questions and I explained to him that he would need to make

\* *Counsel approached petitioner, and motioned to meet outside courtroom, after prosecutor directed him to.*

an appointment if he wanted to discuss specifics, <u>which I believe he later did</u>. At this point, he chose to retain my services. *Petitioner never made Appointment, and then proceed to hire. Counsel declined to even do 1st consultation, without money sent to him by family.

(4). Fourth, Mr. Martinez complains I was ineffective because I <u>failed to file a "Morton discovery request" to suppress defective evidence and exert any exculpatory evidence that would have weighed greatly on the outcome of his case.</u>

<u>My response to this allegation is that all necessary filings were done and all evidence was obtained by my office prior to Mr. Martinez's plea of guilty.</u> He also had the opportunity to review all evidence in the matter, as I forwarded a complete copy of the evidence to him while he was incarcerated in the Nueces County Jail on December 8, 2014. Thereafter, he chose willingly, freely, and voluntarily to plead guilty.

* No DNA results provided, to date.
* No motions filed, no record of such.

(5). Fifth, Mr. Martinez complains that I was ineffective because I <u>failed to fulfill my duties to investigate</u> all of the issues in this case and that I was ill prepared to convey any legal advice. * No independent investigative measures.

<u>My response to this allegation is that as in every case, I spoke with all witnesses that were essential to his defense</u> and <u>viewed all the taped/recorded interviews of the witnesses the prosecution intended to use at trial. I also reviewed every piece of the discovery and the District Attorney's Office's file.</u> Again, after discussing all of his options with him, Mr. Martinez elected to plead guilty.

(6). Sixth, Mr. Martinez complains that I was ineffective because I failed to re-negotiate all expired plea agreements, and <u>gave poor advice to plea out on</u> corresponding conditions that had previously been rejected. Mr. Martinez also complains <u>I made no attempts to advise on post-trial conditions, and failed to disclose any new requirements.</u> Further, <u>Mr. Martinez states I failed to object to</u>

* Counsel was ill-prepared to convey any legal advice.

P 3

unparalled conditions and Mr. Martinez chose to have not agreed to the plea agreement prior to final judgment. * *Counsel does not address issue.*

My response to these allegations is that I have no idea what "corresponding conditions" he is raising that were previously rejected. "Corresponding Conditions" is not a legal term and appears to be fabricated by Mr. Martinez. I, again, don't understand what post-trial conditions would be, other than the fact that he may be referring to probation conditions. If I am correct, then I would affirmatively state that I explained what Judge Watts expected of Mr. Martinez going forward and what conditions he would have. Ultimately, I also explained to him that the final probation conditions would be decided by Judge Watts. I do this in every case for every defendant that I represent. There was no miscommunication whatsoever.

* *Never explained any conditions, nor the lifelong infliction to register as a sex offender.*

(7).    Seventh, Mr. Martinez complains that I was ineffective because I forced or persuaded him to plead guilty and that I threatened to renounce myself from the case, which would cause further delay and, Mr. Martinez would bear the loss of all legal fees paid. Furthermore, the plea was unknowingly and involuntarily entered when I omitted and misrepresented key parts of the plea in efforts to pursue other interests.

My response to this allegation is that Mr. Martinez is lying. I did not force or persuade this man to do anything. Everything he did was done because he chose to do so. His plea was freely and voluntarily entered into and he said as much on the record. Furthermore, I am not able to omit any part of any plea agreement, as all parties, including myself and Mr. Martinez have to review, agree to, and sign the agreement. Thereafter, the plea agreement was read into the record, in front of Mr. Martinez. Here, nothing was omitted or included that Mr. Martinez was not already aware of and had already agreed to as evidenced by his signature on the document and verbally on the record. * *Petitioner did not sign any agreement.*
* *Counsel was ill-prepared to convey any legal advice.*

**(8).**    Eighth, Mr. Martinez complains that I was ineffective because I produced erroneous documents in efforts to sway Mr. Martinez into a plea of guilty.

My response to this allegation is that Mr. Martinez is outright lying. I did not produce any "erroneous document," in an effort to get him to do anything.

*\* Document recovered from his copy of the file, (see Exhibit #21).*

**(9).**    Ninth, applicant complains that I was ineffective because I furnished Mr. Martinez with erroneous advice of the appeals process and probation criteria in efforts to persuade Mr. Martinez to plead guilty.  He also states that I supplied him with deceptive information regarding exculpatory evidence and examining trial dates. Mr. Martinez states I failed to object to post-trial conditions not conforming to any such proposal. Mr. Martinez states he clearly chose to not have agreed to the proposal. *\* Counsel does not address "Exculpatory evidence"*

My response to these allegations is that again, Mr. Martinez is lying and trying to fabricate the facts in front of the court. Mr. Martinez absolutely knew what his appellate rights were at the time of his plea, as explained by Judge Watts on the record and myself prior there to when signing the paperwork. I also explained to him what would be expected of him to do while on probation.

*\* Petitioner filed, pro se, Notice of Appeal, after Counsel stated he kept the option open to Appeal with the D.A. \* (see Exhibit #20).*

**(10).**    Tenth, Mr. Martinez claims that I was ineffective because I denied him justice when I lied about key facts of the case and persuaded Mr. Martinez to concede against his will, in efforts of favoring the prosecution, so to receive a positive outcome for his "imprisoned-disbarred-ex-attorney-father's criminal case." These unethical behaviors were devised illicit acts that were entertained by myself in efforts to advance in a separate matter, and shows to have no regards for Mr. Martinez's welfare. He claims my lawfirm has a long history of unethical practices and are well known for obstructing justice.

P5

My response to these allegations is that clearly as seen above in my response to his first allegation, this claim is not true.  This man's claims are baseless and unfounded and he is trying to use my name and office as a scapegoat for his lies and debauchery. There was "no trading" of his case for benefits in another.

\* *Petitioner's claims are clearly founded, \*(see Exhibits #5 — #11).*

(11).

Eleventh, although not specifically stated as a ground for ineffective assistance of counsel, Mr. Martinez claims that the prosecutor withheld the results of DNA testing.

My response to this allegation is that I was in possession of, and Mr. Martinez reviewed, all pertinent evidence in his case. It was his decision to resolve his case through a plea for deferred adjudication. After being placed on community supervision, his sole actions resulted in him being taken into custody and sentenced to a term of confinement in the Texas Department of Criminal Justice.

\* *To date, "No DNA results" have been made available through numerous attempts to Counsel and D.A.*

_____
Affiant

Subscribed and sworn to before me by the said Clay Bonilla this 23rd day of April , 2018, to certify which witness my name and seal of office.

_____
Notary Public in and for the State of Texas.

NORA ANN VILLARREAL
My Commission Expires
July 19, 2018

P 6

*Item*

(6). = 20 pages

Exhibits # 1 - # 23

CAUSE No. 14-CR-2389-B

*Exhibits # 18, # 19 and # 22 - EXCLUDED.

*Exhibit #1*

**Port Aransas Police Department Case Synopsis**

**Case 201400011398**

**Indecency with a Child**

**Suspect: Fred Martinez**

**Victim: Colby Christy**

On the morning of 07/06/2014, victim alleged that suspect touched the victim's penis over his clothing (blue shorts he was wearing) and the suspect forced him to touch the suspect's penis over the suspects clothing (yellow/orange/pink/blue swim trunks and a white shirt).

Suspect and victim both consented to submit buccal swabs.

We request that the suspect's clothing be analyzed for the presence of or the absence of the victim's DNA. We also request that the victim's clothing be analyzed for the presence of or the absence of the suspect's DNA.

# COR-1407-02991
## Corpus Christi
Date Submitted: 07/14/2014



*Exhibit #2*

## AFFIDAVIT OF DISCOVERY COMPLIANCE

_____Fred Martinez_____           ___201400011398/ Port Aransas Police Department___

**Name of Defendant**                          **Offense Report Number / Agency**

Chapter 39.14 of the Texas Code of Criminal Procedure requires Prosecutors and all Law Enforcement personnel to disclose any and **all** evidence.

Accordingly, it is the responsibility of each and every law enforcement officer to provide all evidence that was discovered and collected during an investigation, including evidence that is exculpatory, mitigation or impeachment evidence. This includes:

All statements made by either the defendant or witnesses (including those which may contradict statements made by any law enforcement employee or witness);

All offense reports related to the offense (Including reports made by evidence technicians);

All logs, including CAO reports and crime scene logs, related to the offense;

All photographs, diagrams, and charts related to the offense;

All audio recordings related to the offense, including 911 calls;

All videos related to the offense;

All notes, whether hand written or not, related to the offense;

All lab reports and expert witness reports related to the offense; and

Any information that could possibly constitute evidence in this case, regardless of whether it is favorable to the prosecution or to the defense.

Compliance with disclosure requirements continues until the final disposition of each and every criminal case. As such, the investigating officer agrees to supplement the filed case with any additional information that comes into the possession of the law enforcement agency. It is the responsibility of the investigating officer to provide the District Attorney's Office with any additional evidence discovered after the case is filed.

By signing below, I am swearing that this file contains all evidence relating to this case and that I agree to supplement the District Attorney's file if any other evidence becomes available.


_____ 2223                      07/06/2014
                                                 _____
**Investigating Officer / ID Number**                        **Date**


01/01//2014

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## CRIME LABORATORY

### Laboratory Submission Form
LAB-05 Rev.01 (05/2013) p.1 Issued by: QAC

☒New   ☐Additional   ☐Resubmission
☐Corrected Copy

**COR-1407-02991**
**Corpus Christi**
Date Submitted:07/14/2014

*Rmb*

Date Resubmitted_____

| | |
|---|---|
| **Agency** | Port Aransas Police Department |
| **Agency Case #** | 201400011398 |
| **Offense** | PC 21.11 - Indecency with A Child |
| **Offense Date** | 07/06/2014 |
| **Offense County** | Nueces |

☒Drop Box   ☐Mail/Certified   ☐Other_____

Printed Name _____   Agency _____

Signature _____   Date _____

## Case Contact Person Information

| | |
|---|---|
| **Title/Full Name** | Sgt. Mike Hannon | **Badge Number** 2206 |
| **Physical Address** | 705 W Ave A | **Phone** 361-749-6241   **Fax** 361-749-4538 |
| **City, State, Zip** | Port Aransas, TX 78373 | **Email** mhannon@cityofportaransas.org |

### Individual (S=Suspect, V=Victim, E=Elimination)

| S / V / E | Name (Last, First, Middle) | Sex | Race | DOB | State | Driver License # | State ID # |
|---|---|---|---|---|---|---|---|
| S | Fred Martinez | M | W | 02/18/1974 | TX | 00737618 | |
| V | Colby Christy | M | W | 08/06/2001 | | | |
| | | | | | | | |
| | | | | | | | |

### Description of Evidence Submitted   (Attach Brief Synopsis/Offense Report For All Cases Except Drug/Blood Alcohol Cases)

| Agency Item # | # of Items | Description of Evidence *Please indicate if item is Probable Cause* | Source | Type of Exam(s) Requested |
|---|---|---|---|---|
| 1 | 2 | White shirt and yellow/orange/pink/blue swim trunks worn by suspect | Suspect | DNA analysis |
| 2 | 1 | Blue shorts worn by victim | Victim | DNA analysis |
| 3 | 2 | 2 buccal swabs from victim | Victim | DNA comparison |
| 4 | 2 | 2 buccal swabs from suspect | Suspect | DNA comparison |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Exhibit #4*



CAUSE NO. _____14-CR-2389-B_____

| | |
|---|---|
| THE STATE OF TEXAS | IN THE __117TH__ DISTRICT COURT |
| VS. | OF NUECES COUNTY, TEXAS |
| __FRED G. MARTINEZ__ | |

### MOTION FOR NEW TRIAL

To the Honorable Judge of Said Court:

Now comes the Defendant in the above styled and numbered cause, by and through his undersigned attorney, and pursuant to Vernon's Ann.Rules of App.Pro., Rule 21, Files this his Motion for a New Trial, and would respectfully show the Court the Following:

#### I.

After the Defendant was convicted for the offense of __Indecency with a child__, a sentence of __10 years deferred adjudication__ was imposed in open court on the __2nd__ day of __January__, 2015. Thirty days has not elapsed since the imposition of said sentence.

#### II.

During the course of the trial the prosecutor intentionally and knowingly engaged in material misconduct that was reasonably likely to affect and did affect the judgment of the Presiding Judge, to-wit:

(a) Presiding prosecutor sought personal vengeance towards defendant due to a disagreement with defendant's relative, and prosecutor took initiative to hold an unprofessional attitude upon defendant during reasonable judgment during plea negotiations and agreements.

(b) Defendant was made aware during attorney's recorded confession of presiding prosecutor's motive to be unfair and would seek a harsher punishment on said case for personal gain of court recognition in trying a case of this degree for the first time before presiding judge.

#### III.

The attorney for the defendant rendered ineffective assistance of counsel during the trial, to-wit:

(a) Attorney delivered false punishment limitations to defendant prior to entering a guilty plea.
(b) Attorney convinced defendant to enter a guilty plea to said charges to acquire personal gain.
(c) Attorney mislead and intentionally misinformed defendant in regards to early termination of imposed sentence.
(d) Attorney mislead and intentionally misinformed defendant in regards to Sex Offender's Registration requirements.
(e) Attorney shared confidential and sensitive material with opposing party (prosecutor).
(f) Attorney failed to submit proper motions to properly defend said case.
(g) Attorney neglected to interview defense witnesses.
(h) Attorney failed to present valuable evidence to D.A.'s Office to support defendant's innocence to remedy case.
(I) Attorney failed to demonstrate interest to properly try said case.
(j) Attorney intentionally and knowingly discouraged defendant in utilizing a "trial by jury" with no reasonable merit.
(k) Attorney intentionally and knowingly encouraged defendant to take a "plea offer" with no reasonable merit.

Attorney for Defendant/Defendant Pro Se

Defendants Cimims Filed on 23-2015

*Exhibit #5*

Client Has Problems With His Lawyer

HOME    COLUMNS    BACK ISSUES

Search

# Client Has Problems With His Lawyer

CAMERON LANGFORD    March 30, 2012

SAN ANTONIO (CN) — A car accident victim claims in court that a lawyer sent a runner to his home to solicit him as a client, then transferred settlement money to a non-IOLTA trust account controlled by the attorney's son, who is a disbarred lawyer.

David Torres sued The Law Offices of William D. Bonilla PC and David Bonilla, of Corpus Christi, in Bexar County District Court.

"Plaintiff was involved in an automobile accident on or about September 12, 2011," Torres say in the complaint. "The very next morning, a case runner who identified himself as John Bonine with the Texas Motor Vehicle Accident Co. appeared at plaintiff's doorstep and attempted to and did solicit plaintiff for legal services related to the accident.

"On information and belief John Bonine has illegally solicited cases for defendant William D. Bonilla in the past and continues to actively illegally solicit cases for defendants William D. Bonilla and The Law Offices of William D. Bonilla, P.C."

Bonine is not named as a defendant.

Torres claims in his complaint that the Bonillas "are involved in an intricate criminal conspiracy, the object of which is to commit the crime of barratry".

Torres says that after he hired William Bonilla, "all conversations and communications with plaintiff were carried out by defendant David Bonilla. On information and belief, defendants William D. Bonilla and The Law Offices of William D. Bonilla, P.C. transferred settlement funds belonging to plaintiff to a non-IOLTA trust account which was owned and operated by defendant David Bonilla. Proceeds from plaintiff's settlement proceeds were paid to plaintiff and to medical providers out of an account that was in defendant David Bonilla's name. Since David Bonilla is, according to the State Bar of Texas, disbarred, he cannot have or control an IOLTA trust account."

David Bonilla is William Bonilla's son, according to NBC News' Corpus Christi affiliate, KRIS-TV.

Torres's complaint continues: "On information and belief, the transfer of the funds to David Bonilla may have been part of an elaborate scam the object of which was to defraud the Texas Attorney General's Office out of monies that should have been paid on an outstanding child support lien. Transfer of client funds to a non-IOLTA trust account violated William D. Bonilla fiduciary duty to his client (plaintiff) and submitting fraudulent representations to the Texas Attorney General's Office caused plaintiff damages." (Parentheses in complaint.)

KRISTV.com    that David Bonilla was charged in October 2009 with theft and misappropriation of property charges. He was disbarred in that year, KRISTV.com reported.

David Bonilla pleaded guilty to six counts of misuse of fiduciary property and one count of theft after taking more than $500,000 from 37 clients, KRISTV.com reported in May 2011.

Torres seeks disgorgement of his legal fees and damages for violation of Texas Government Code, breach of fiduciary duty and conspiracy.

He is represented by Scott Tschirhart with Cabin & Shaw in San Antonio.

*Exhibit #6*



ABA JOURNAL

podcast

Legal Rebels
Modern Law Library
Asked & Answered

Home / Daily News / Ex-attorney put on probation in $500K client...

WHITE-COLLAR CRIME

# Ex-attorney put on probation in $500K client theft now gets 10 years for drinking, practicing law

POSTED AUG 21, 2014 09:30 PM CDT

BY MARTHA NEIL (HTTP://WWW.ABAJOURNAL.COM/AUTHORS/5/)

A disbarred Texas lawyer was sentenced to 10 years in prison on Wednesday for violating the terms of his probation in a client-theft case.

David Bonilla, 59, got a suspended prison sentence and was put on probation for 10 years in 2011, when he pleaded guilty to stealing some $500,000 from clients while he was still in practice, the Corpus Christi Caller Times (http://www.caller.com/news/local-news/crime/former-attorney-david-bonilla-to-appear-for-probation-hearing_08005410) reports. The newspaper said Bonilla made restitution in the same amount to 37 clients at the same time he took the plea deal in the Nueces County case.

After his disbarment, Bonilla was employed at his dad's law firm as a legal assistant. At a Wednesday hearing, however, Bonilla admitted he had illegally practiced law while working there. He also admitted drinking alcohol, which he was prohibited from doing.

His father, William Bonilla, voluntarily gave up his own law license last year to preclude attorney discipline related to his son's practice at his firm, the newspaper says.

In courtroom filled with David Bonilla's family and friends, including a son who is also an attorney, 319th District Judge David Stith said he, too, has known the family a long time but had to impose a fair sentence.

KRIS (http://www.kristv.com/news/david-bonilla-headed-to-prison/) says a local bar association received complaints and contacted Corpus Christi police, leading to the probation violation case against Bonilla.

Bonilla didn't offer any statement at the sentencing, and he and his lawyer declined to comment afterward.

Copyright 2017 American Bar Association. All rights reserved.



*Exhibit # 7*

# Former attorney David Bonilla asks for release from prison

Posted: Feb 06, 2015 10:55 AM PST
Updated: Feb 16, 2015 7:34 PM PST
By Caroline Flores

CORPUS CHRISTI - He's only served five months of a ten year prison sentence, but former attorney David Bonilla says he's had enough. Bonilla is asking to be let out of prison early.

Bonilla was granted probation once before, in 2011, after pleading guilty to theft for keeping money that belonged to his clients had been awarded to his clients.



Former attorney David Bonilla asks for release from prison on charges he misused client settlement money.

In August of 2014, following a CCPD investigation into claims of probation violation by the Corpus Christi Bar Association, Judge David Stith sent Bonilla to prison for 10 years.

But Bonilla was back in Stith's court on Friday, after requesting to be let out of prison early.



Former attorney David Bonilla broke down Friday describing his time in prison.

Bonilla described his experiences on the way to Garza unit in Beeville and some of the things he witnessed there.

He said, "The guards are constantly berating you and yelling at you I guess it's because they're trying to get control."

Bonilla also described the filthy floors, relentless noise, constant fights, and isolation from his family.

"I didn't expect that. I didn't expect that in our state, our country that we treated men as slaves. Like cattle," he said.

He also testified about what he considered an addiction to being viewed as successful, which ultimately lead to the spending of his clients' money and later stealing money from the accounts at his family's law firm.

His therapist also said he is showing signs of depression and anxiety from his time in prison.

No decision was made Friday on Bonilla's request for probation.

The hearing will resume Monday morning.

If he's not released, he won't be eligible for parole until August of 2016.

*P. 19*



*EXHIBIT #8*

# Hearing resumes for former attorney seeking shock probation

Posted: Feb 09, 2015 8:53 AM PST
Updated: Feb 09, 2015 11:54 AM

CORPUS CHRISTI - He's only served five months of a ten year prison sentence, but former attorney David Bonilla says he's had enough. Bonilla is asking to be let out of prison early.

Bonilla was granted probation once before, in 2011, after pleading guilty to theft for keeping money that belonged to his clients, that they had been awarded.



Former attorney David Bonilla asks for release from prison on charges he misused client settlement money.

**Former attorney David Bonilla asks for release from prison**

In August of 2014, following a CCPD investigation into claims of probation violation by the Corpus Christi Bar Association, Judge David Stith sent Bonilla to prison for 10 years.

A therapist testified today on Bonilla's mental state, how prison is affecting him, and whether his release would make any difference. In her opinion staying in prison would not benefit Bonilla.

Several former Bonilla clients also testified about how his actions impacted their lives. One client told the court he had no idea he had won a settlement from an insurance company until the police started investigating Bonilla.

On Friday, Bonilla described his experiences on the way to Garza unit in Beeville and some of the things he witnessed there.

He said, "The guards are constantly berating you and yelling at you I guess it's because they're trying to get control."

Bonilla also described the filthy floors, relentless noise, constant fights, and isolation from his family.

"I didn't expect that. I didn't expect that in our state, our country that we treated men as slaves. Like cattle," he said.

He also testified about what he considered an addiction to being viewed as successful, which ultimately led to the spending of his clients' money and later stealing money from the accounts at his family's law firm.

If he's not released, he won't be eligible for parole until August of 2016.

*P.16*



*EXHIBIT #9*

# Local man argues against Bonilla's release, says he's owed 300K

Posted: Feb 09, 2015 11:12 AM PST
Updated: Feb 19, 2015 11:16 AM PST

CORPUS CHRISTI - Former Attorney David Bonilla is in court today, requesting to be released from prison early. However, one local man is adamantly against his early release.



"I thought he was a good person, he wasn't."

76-year-old Larry White said he's just one of the many people who lost money to Former Attorney David Bonilla.

Bonilla pleaded guilty to theft back in 2011, after spending hundreds of thousands of dollars of his clients' money. Now, he's pleading to be put back on probation.

White stood outside of the court house for hours today with a sign that said, "No Probation for Bonilla."

He held in his hand a bounced check from Bonilla, for $300,000.00.

It was supposed to be a business investment, but instead, White said he and his wife lost their retirement money.

"I ended up having to pay it off," said White. "It took me like seven years."

That's seven years of hard earned money that White believes he'll never get back.

Meanwhile, Bonilla has served only a few months of his ten-year prison sentence.

Bonilla's attorney is arguing for his client's release, citing suffering from anxiety and depression.

White thinks Bonilla should have to pay full-price for his crime.

"As far as I'm concerned, ten years and the other two years too."

If the Judge does decide to keep him in prison, Bonilla will have to spend at least another year and a half there.

He's not eligible for parole until August 2016.

*P.15*

*Exhibit #10*

KRISTV.COM

# Judge denies David Bonilla's shock probation motion

Posted: Feb 09, 2015 3:52 PM PST
Updated: Feb 09, 2015 06:52 PM
By Caroline Flores

CORPUS CHRISTI - Disgraced attorney David Bonilla will remain in prison. Bonilla's shock probation motion has been denied by Judge David Stith.

Bonilla requested that he be released from prison and placed back on probation after serving only a few months of a 10-year sentence. Judge Stith allowed some of Bonilla's victims to take the stand Monday before he denied the request.



David Bonilla's motion for shock probation was denied by Judge David Stith.

"I forgive David for what has been done to us as victims. But as far as being paroled early, I'm not in favor of it," said a former client of Bonilla, Eric Killian.

Victim after victim took the stand today to tell Judge Stith how they feel about Bonilla's shock probation request.

"I really don't want him to get out. But that's up to the courts," said another former client Robert Cage.

Back in 2011, Bonilla pleaded guilty to theft for stealing hundreds of thousands of dollars from his clients and received probation. But Bonilla was caught doing it again when he returned to his family's law firm and was eventually sentenced to prison time. Time his clients say he deserves.

"It caused me and the wife to basically use a lot of our savings, or 90 percent of our savings and our 401k. And to this day we still have financial problems," said Killian.

"I think he should serve his term. He had his chance to out on... on ... to be out like everybody else. He broke the terms of his probation. I think he should serve it," said another former client of Bonilla's.

Because Judge Stith denied his motion for shock probation, Bonilla will have to spend at least another year and a half behind bars. He's not eligible to be considered for parole until August of 2016.

≡ SECTIONS    Search...    ○    **Caller Times**    ◉ 91°    ♟ SUBSCRIPTION

*EXHIBIT #11*

**CRIME**

# Imprisoned former lawyer David Bonilla gets parole

*By Krista M. Torralva of the Caller-Times*

💬0  f  y  ✉  🖨



David Bonilla

Former lawyer David Bonilla will be released from prison after serving two years of his 10-year sentence.

Bonilla is scheduled to be released in August 2016, the state's pardons and parole board decided Wednesday, according to the Texas Department of Criminal Justice online records.

Bonilla was disbarred in 2009 — the most serious sanction for lawyers — and in 2011 pleaded guilty to felony charges of stealing more than $500,000 from clients while he was a lawyer at his father's firm. He paid restitution to 37 former clients and was placed on probation but that was revoked in August 2014 after he admitted to twice violating conditions.

On Thursday, District Attorney Mark Skurka expressed discontent at the decision.

"It is unfortunate that a person that has caused so much harm to so many people is going to be released back into the community he betrayed after just serving a small fraction of his 10-year sentence," Skurka said.

Attempts to reach Bonilla's father, William Bonilla Sr., and son Clay Bonilla, were unsuccessful late Thursday. His attorney, Angelica Hernandez, declined to comment.

Clay Bonilla is now head of The Law Offices of William Bonilla, P.C., which his grandfather established in 1953. William Bonilla built a reputation as an advocate for the disadvantaged and for Hispanic rights. William Bonilla surrendered his law license in June 2013, and court

*p.18*

*Exhibit* 
*#12*

December 3, 2014

Mr. Fred Martinez
SID #10134172
P.O. Box 1529
Corpus Christi, Texas 78403-1529

Mr. Fred Martinez
1015 El Dorado
San Antonio, Texas 78225

Dear Fred:

Please find enclosed along with this letter a copy of the motion to reinstate bond that we filed on your behalf on December 2nd. The hearing on our motion to reinstate has been scheduled for Monday, December 8, 2014 at 8:15 a.m. That is the earliest possible date that the court would allow.

I will meet with you in court at that time and should have more news for you when we go to court. I look forward to visiting with you soon.

Yours very truly,

Clay Bonilla
Attorney at Law

CB:vl
2014\14-0565w\Letter\client.120314

*Exhibit #13*



# IN THE DISTRICT COURT
## OF NUECES COUNTY, TEXAS
## THE 117th JUDICIAL DISTRICT OF TEXAS

THE STATE OF TEXAS
Vs.                                                   No. *14 CR 2389.B*
*FRED MARTINEZ*

### COURT'S WRITTEN ADMONISHMENTS TO DEFENDANT
### ON DEFENDANT'S PLEA OF GUILTY OR NOLO CONTENDERE

The Defendant herein has informed the Court that he/she desires to enter a plea of guilty or a plea of nolo contendere in this cause. Accordingly, pursuant to Art. 26.13(d), Texas Code of Criminal Procedure [Tx.C.Cr.P.], the Court admonishes the Defendant in writing as follows:

**Perjury Admonishment.** When the hearing begins, you will be placed under oath. *You are now warned that any statements you make must be the truth.* If you make a false statement during this hearing, you may be charged with the offense of aggravated perjury, which is punishable by imprisonment in the state penitentiary for any term of not more than 10 years or less than 2 years and a fine not to exceed $10,000; or you may be held in contempt of court, which is punishable by confinement in jail for a term not to exceed 180 days or by a fine not to exceed $500 or both; and if you are granted community supervision, your community supervision may be revoked, and you may be sent to prison or the State Jail.

**Offense Charged.** You are charged with the offense of *Ct 1-2 Indecency W/ child*  alleged to have occurred in Nueces County, Texas on *7/6/14* . The punishment range applicable for this offense is stated in the "Court's Written Admonishments on Range of Punishment" also given to you this date. Please refer to that part of the admonishments for the range of punishment applicable in your case. Should you have any questions about the range of punishment, please ask them during the hearing.

**Court Not Required to Accept Punishment Recommendations.** In assessing your punishment, the Court may consider recommendations made by the State or your attorney, but the Court is not required to accept or follow any recommendations so made. Whether you are found guilty or your adjudication is deferred, the Court will consider the evidence and then assess whatever punishment the Court feels is proper regardless of any recommendations made.

**Plea Bargain Agreement.** You and your attorney may enter into a plea bargain agreement with the State. If the Court accepts your plea and approves the agreement, the Court will follow the agreement and assess your punishment not to exceed the plea bargain. Keep in mind that the Court does not participate in any plea bargaining or negotiation in any case.

**May Withdraw Plea.** If the Court rejects the plea bargain agreement, you will be allowed to withdraw your plea, if that is what you want to do. Your case will then be set for trial before the Court or a jury on your plea of not guilty, unless you reach another agreement acceptable to the Court.

**Limited Appeal.** If the Court does accept the plea bargain agreement, and the punishment does not exceed the punishment recommended by the State and agreed to by you, you may appeal (1) only those matters that were raised by written motion filed and ruled upon by the Court before the plea, or (2) after getting the Court's permission to appeal. This means that you have a limited right to appeal if the Court follows the plea bargain.

**If No Plea Bargain.** If you enter a plea of guilty/nolo contendere without a plea bargain agreement and the Court makes a sentencing decision that you do not like, you have the right to appeal. But, because you entered such a plea without a plea bargain agreement, your right to appeal may be extremely limited. You will likely lose on appeal.

**Voluntary Plea.** Your plea must be voluntary. The Court cannot accept your plea if anyone forced you, tried to force you or persuaded you to make that plea; or if anyone threatened you or promised you anything to get you to make that plea; or if your plea is influenced by any consideration of fear or a delusive hope of a pardon prompting you to confess your guilt. *Your plea must be of your own free will.*

**Basis for Guilty Plea.** Your plea of guilty may be accepted by the Court only if you are in fact guilty; you should not plead guilty for any other reason.

**FILED**

JAN 02 2015

*ANNE LORENZEN, CLERK*
COUNTY & DISTRICT COURTS NUECES COUNTY, TEXAS

*EXHIBIT # 14*

## CAUSE NO. 13-15-000084-CR

# IN THE COURT OF APPEALS
## THIRTEENTH JUDICIAL DISTRICT OF TEXAS
## CORPUS CHRISTI OFFICE

### FRED MARTINEZ,

#### *Appellant*

### V.

### THE STATE OF TEXAS,

#### *Appellee*

### MOTION TO WITHDRAW AS COUNSEL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Movant, CLAY BONILLA, attorney for Appellant, in the above entitled and numbered cause and files this his Motion to Withdraw as Counsel and would respectfully show the Court the following:

1. Counsel for Defendant was just notified that Defendant filed an appeal on his own behalf on February 3, 2015.

2. Counsel for defendant can no longer effectively communicate with said Appellant, FRED MARTINEZ.

3. This motion is not made for delay but only that justice may be done.

WHEREFORE, Movant prays that the Court grant this request to withdraw as counsel and further requests this matter be scheduled for a hearing at the earliest date to allow Defendant,

RECEIVED

FEB 2 0 2015

NUECES COUNTY
DISTRICT ATTORNEY'S OFFICE

P. 20



EXHIBIT #15



OFFICE OF THE                                          DISTRICT ATTORNEY

**MARK SKURKA**
DISTRICT ATTORNEY
105TH JUDICIAL DISTRICT
NUECES COUNTY

901 LEOPARD, ROOM 206
NUECES COUNTY COURTHOUSE
CORPUS CHRISTI, TX 78401-3681

TELEPHONE
361-888-0410 FELONY DIVISION
361-888-0286 MISDEMEANOR DIVISION
361-888-0348 HOT CHECK DIVISION

FACSIMILE
361-888-0399 FELONY DIVISION
361-888-0700 MISDEMEANOR DIVISION
361-888-0381 VICTIM ADVOCATE

# FAX
# TRANSMITTAL

DATE: **DECEMBER 15, 2014**

TO: **CLAY BONILLA      881-1031**

FROM: Jacqueline Rae Lamerson, Assistant District Attorney
District Attorney's Office
Phone No. (361) 888-0410***Fax No. (361) 888-0700

RE: **PLEA OFFER  FRED MARTINEZ  14-2389-8**

**10 TDC/ 10 PROBATION: $2,500 FINE; REQUIRED TO REG. AS SEX**

**OFFENDER; SEX OFFENDER REQUIREMENTS OF COMM. SUP.;**

**180 DAY SANCTION W/ ISF COGNITIVE TO FOLLOW. NO CONTACT W/ VICTIMS;**

**CURFEW; CONTINUED GPS MONITORING AFTER SANCTION+ISF.**

NUMBER OF PAGES SENT (including cover sheet): _____ 1

Please call if you do not receive all pages as indicated on this transmittal sheet.

### PERSONAL AND CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGE
### ATTORNEY WORK PRODUCT

*The information contained in this facsimile is intended only for the personal and confidential use of the designated recipient named above. This message may be attorney-client communication and/or may be attorney work product and as such is privilege and confidential. The attorney-client privilege and attorney work product privilege are expressly retained and intended to be preserved if the reader of this message is not the intended recipient you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return to us by mail*

*Exhibit #16*

December 16, 2014

Mr. Fred Martinez
SID #10134172
P.O. Box 1529
Corpus Christi, Texas 78403-1529

Dear Fred:

      Please find enclosed the offer I informed you of on December 16, 2014. We certainly have not agreed to anything on your behalf and this was forwarded to me without provocation. I will visit with the DA's office between now and then to get more details. I also look forward to visiting with you on Friday at the plea deadline.

                    Yours very truly,

                    Clay Bonilla
                    Attorney at Law

CB:vl
2014\14-0565w\Letter\client.121614

*Exhibit #7*

CAUSE NO. 14-CR-2939-B (Counts 1+2)

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 117 JUDICIAL DISTRICT |
| | § | |
| FRED MARTINEZ | § | NUECES COUNTY, TEXAS |

## PLEA AGREEMENT

The Defendant named above is charged by information (indictment) in this case with the offense(s) of INDECENCY WITH CHILD (COUNTS 1+2) and agrees as follows:

☑ To plead **guilty / nolo contendere** to the offense(s)
    ☑ as charged
    ☐ or to the lesser included offense(s) of _____
☑ To waive all pretrial motions on file.
☑ To waive his/her right against self-incrimination and make a written/oral **judicial confession** under oath.
☑ To be punished as recommended by the State.
☐ **(Deadly Weapon finding)** To agree to a finding by the Court on the use/exhibition or attempted use/exhibition of a deadly weapon.

**In consideration of the defendant's plea of guilty / nolo contendere, the State agrees:**

☐ **(TDC)** to recommend to the Court that punishment be assessed at confinement in the Texas Department of Criminal Justice - Institutional Division for a term of _____ years.
☐ **(State Jail)** to recommend to the Court that punishment be assessed at confinement in the Texas Department of Criminal Justice - State Jail Facility for a term of _____ days / months / years.
☐ **(TPC 12.44(a) Punishment)** to recommend that Defendant be punished under Texas Penal Code §12.44(a).
☐ **(TPC 12.44(b) Punishment)** to recommend that Defendant be punished under Texas Penal Code §12.44(b).
☐ **(Nueces County Jail)** to recommend to the Court that punishment be assessed at confinement in the Nueces County Jail for a term of _____ months / days.

☐ **(Sentence Suspended)** to recommend to the Court that the confinement be suspended and that the Defendant be placed on community supervision for a period of _____ months / years.
☑ **(Deferred Adjudication)** to recommend that the Court defer adjudication of guilt and place the Defendant on community supervision for a period of 10 months / years.

☑ **(Fine)** to recommend to the Court that the defendant be punished by a fine of $ 2,000.
☐ **(Fine Suspended)** and further recommend suspending $_____ amount of said fine.

☑ **(Probation Conditions)** to recommend to the Court that as a condition of community supervision, the Defendant be ordered the following: AGREED TO STANDARD CONDITIONS... JUDGE TO PLACE SPECIAL CONDITIONS

| | | | |
|---|---|---|---|
| ☐ GED | ☑ DOEP | ☐ Felony VIP | ☐ _____ CS Hours |
| ☐ HS Diploma | ☐ CBOP | ☐ Theft Class | ☐ _____ Days in NCJ |
| ☐ SATF | ☐ TAIP Evaluation | ☐ Family Violence Caseload | ☐ Anger Management |
| ☐ SAFPF | ☐ BIPP / AIR | ☐ MHMR Caseload | ☐ Felony DWI Conditions |
| ☐ RITE | ☐ SCRAM | ☐ Parenting Classes | ☐ Felony Theft Conditions |
| ☐ ELM | ☐ Ignition Interlock | ☐ Curfew | ☐ Felony Drug Conditions |
| ☐ Other _____ | | | |

NEVER AGREED TO THIS

Exhibit #20



RECEIVED on 2/3/15
by the 117th District Court

CAUSE NO. _____ 14-CR-2389-B _____

THE STATE OF TEXAS

VS.

FRED G. MARTINEZ

IN THE __117TH__ DISTRICT COURT

OF NUECES COUNTY, TEXAS

FILED-ANNE LORENTZEN
BY_____DEPUTY
2015 FEB -3 PM 4:04
CLERK OF COUNTY &
DISTRICT COURTS
NUECES COUNTY, TEXAS

**NOTICE OF APPEAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Today, this ___30th___ day of ___January___ , 2015 , the defendant gives Notice of Appeal of his conviction.

☐ The defendant also asks the court to set bail.

_____
Defendant

_____
Attorney (Signature)

_FRED MARTINEZ_
Attorney / Defendant Pro Se (Print)

_1015 El Dorado St._
Address

_San Antonio, TX 78225_
City, State, Zip

_210-612-7070_
Telephone Number / Fax Number

_NONE - Pro Se_
State Bar Number

**ORDER**

Bail is:

☐ set at $ _____.

☐ to continue as presently set.

Date signed:_____

_____
Judge Presiding, _____ District Court
County Criminal Court at Law No. ____
Nueces County, Texas

*Exhibit #21*

Cause No. 14AR2338iB

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| vs. | § | 117TH DISTRICT COURT |
| FRED MARTINEZ | § | NUECES COUNTY, TEXAS |

## MOTION TO WITHDRAW AS COUNSEL

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now CORETTA T. GRAHAM, attorney for FRED MARTINEZ, Defendant in the above-entitled and numbered cause, and moves the court to enter an order permitting movant to withdraw as counsel of record in this cause, and in support of such motion shows:

Counsel is withdrawing from all remaining NUECES county cases. There has arisen an irreconcilable dispute between FRED MARTINEZ and the undersigned which render counsel unable to adequately represent the Defendant in that Counsel and Defendant failed to pay retiner fee for Counsel's legal representation , and FRED MARTINEZ desires to proceed with another attorney on his case.

**The cause is next set for an EXAMINING TRIAL on NOVEMBER 13, 2015.**

WHEREFORE, movant prays the court grant this motion and order that Coretta T. Graham be released as counsel of record in this cause.

Respectfully Submitted,

GRAHAM LEGAL SERVICES
3206 Reid Dr 105
Corpus Christi, TX 78404
Tel: (361) 723-1530
Fax: (361) 723-1531

By: _____
CORETTA T. GRAHAM
State Bar No. 50511851
Attorney for DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above Motion to Withdraw as Counsel was delivered in accordance with the Texas Rules of Civil Procedure to the parties of record on or about NOVEMBER 7, 2014.

_____
CORETTA T. GRAHAM

*Exhibit #23*

February 26, 2015

Court of Appeals
Thirteenth District of Texas
901 Leopard, 10th Floor
Corpus Christi, Texas 78401

      Re:    Cause No. 13-15-00084-CR
             Tr.Ct.No. 14-CR-2389-B
             Fred Martinez v. The State of Texas

Gentlemen:

Pursuant to the Honorable Court's Order, I am including a copy of the Trial Court's Certification of Defendant's Right to Appeal from Cause No. 14-CR-2389B. I have reviewed the record and I have determined that Mr. Martinez, pursuant to the plea bargain that he freely and voluntarily entered into, waived his right to appeal. In fact, Mr. Martinez was admonished on this particular fact by Judge Watts on the record and was made fully aware of the consequences that would ensue if Judge Watts accepted the plea bargain. He chose to proceed.

As per the record and evidence I reviewed, Judge Watts accepted the plea bargain and Mr. Martinez has no right to appeal. The Trial Court's Certification of Defendant's Right to Appeal was signed in the 117th District Court on January 2, 2015. I have not been able to locate any amended certification of his right to appeal.

Therefore, I do not believe that Mr. Martinez has a right to appeal under these circumstances. Pursuant to the same, I will not be filing a Motion with this Honorable Court explaining why he has a right to appeal, because I do not feel that he does. I am also including along with this letter a copy of the file stamped Motion to Withdraw that I filed in the 117th District Court on February 20, 2015. By copy of this letter I am notifying appellant of the submission. If you have any other questions or concerns, please do not hesitate to contact me.

Yours very truly,

Clay Bonilla
Attorney at Law

CC    Fred Martinez
        1015 El Dorado
        San Antonio, Texas 78225

CB:nv
ENCLOSURE: as stated
2014/14-0565w/letters/022615.appeal

Fred G. Martinez
#2067534 Stiles
3060 Fm 3514
Beaumont, TX 77705

**CERTIFIED MAIL**

7017 1070 0000 2498 4305



UNITED STATES
POSTAL SERVICE

Clerk, U.S. District Court
Southern District of Texas
FILED

AUG 3 0 2018

David J. Bradley, Clerk of Court

U.S. District Court

1133 N. Shoreline Blvd.

Corpus Christi, TX 78401

Fred G. Martinez
#2067834 Stiles
3060 Fm 3514
Beaumont, TX 77705

**CERTIFIED MAIL**

7017 1070 0000 2498 4305

UNITED STATES
POSTAL SERVICE

100

Clerk, U.S. District Court
Southern District of Texas
FILED

AUG 3 0 2018

David J. Bradley, Clerk of Court

U.S. District Court

1133 N. Shoreline Blvd.

Corpus Christi, TX 78401